**William LOVETT, Plaintiff,**

v.

**Dale FOLTZ, Defendant.**

**Civ. A. No. 86–CV–70688–DT.**

United States District Court,
E.D. Michigan, S.D.

May 31, 1988.

---

Arthur Tarnow, Detroit, Mich., for plaintiff.

Thomas Kulick, Lansing, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

Petitioner, William Lovett, is presently incarcerated in the Michigan state prison system where he is serving a term of life imprisonment for felony murder. He had been found guilty by a jury under M.C.L.A. § 750.316 in July 1975.[1]

On July 31, 1987, this Court referred the multiple legal issues that had been raised by him in his Petition for a Writ of Habeas Corpus to Magistrate Paul J. Komives.

Following an evidentiary hearing, the Magistrate submitted a report in which he recommended to this Court that it deny the Petition. Timely objections to the Magistrate's Report have been filed by Lovett. The matter is now before this Court for a decision.

### I.

The procedural background of this case, which was outlined in the July 31, 1987 Order of this Court is incorporated by reference. The Magistrate has also provided this Court with an excellent summary of the relevant facts that are involved in this controversy:

Sometime between 5:30 and 6:00 P.M. in the early evening of January 22, 1975, Linda Colby, a fifteen-year old babysitter, was brought to the house of Debbie Guster by her father. Linda Colby had been to this home on one or more prior occasions for the same purpose. Shortly before 6:00 P.M., Debbie Guster left her home with Margaret "Mickey" Mannion and James Sovey who were co-workers at the Stardust Lanes, a bowling alley a short distance away. Debbie Guster's car was in the driveway and was not operable at this time. Linda Colby was left alone with Debbie Guster's two small children, ages 3 and 6. The three co-workers arrived at the bowling alley and punched in at 6:03 P.M. Subsequently, James Sovey, who was a porter at the bowling alley, left the Stardust Lanes, having completed his work for the evening. With the knowledge and consent of Debbie Guster, James Sovey returned to Debbie Guster's home and spent a few hours there. James Sovey and his girlfriend Mickey Mannion had previously done babysitting service for Debbie Guster and he was known to her children as Uncle Jim. Both Mickey Mannion and James Sovey were young adults in their early twenties. Sometime prior to midnight, James Sovey called the Stardust Lanes and then returned to the bowling alley to await Mickey Mannion's comple-

---

1. In its earlier Opinion, this Court incorrectly stated that the jury had found Lovett guilty in June 1975.

tion of her shift. Mickey Mannion completed her shift at 1:00 A.M., but prior to leaving the bowling alley, and at the request of Debbie Guster, she called Debbie Guster's home to ask the babysitter, Linda Colby, if she could remain for a longer period than previously arranged, since Debbie Guster now expected to remain at the bowling alley past 2:00 A.M. When this call was placed to Debbie Guster's home ... Lovett was at the front door. He entered the home and attempted to speak to Debbie Guster over the telephone but was told that Debbie Guster would not speak with him at this time but would talk to him later. Lovett left Debbie Guster's home a few minutes past 1:00 A.M. and went to the Stardust Lanes with the intention of meeting Debbie Guster. He was unsuccessful in this effort and after remaining at the Stardust Lanes for a short period of time left the Stardust Lanes sometime between 1:15 and 1:30 A.M. in the early morning of January 23, 1975.

Lovett was married to Beverly Lovett, who was called as an alibi witness in this case. However, he had had a relationship, including sexual intercourse, with Debbie Guster for a considerable period of time. On the evening of January 22, 1975, ... Lovett, after finishing work for the day, participated in a basketball game with several friends. His wife Beverly and their two children were at this game and remained with ... Lovett for a period of time afterward. Beverly Lovett then returned home with the two children with the understanding that ... Lovett would return home no later than 11:30 P.M. .. Lovett did not return at this time but remained in the company of his friends drinking beer at one location or another until some time prior to 1:00 A.M. At that time, ... Lovett, instead of returning home, drove to the house of Debbie Guster, with the apparent intention of continuing his relationship with her. When Lovett could not speak to Debbie Guster over the telephone, he went to the bowling alley but was rebuffed there as well. On a prior occasion, some months before, Lovett had struck Debbie Guster with a closed fist or in a slapping manner during or after engaging in sexual intercourse with her. While ... Lovett testified that Debbie Guster had invited this slap in a masochistic manner, Debbie Guster testified that it was a blow struck in anger by Lovett and that as a result of this occurrence, she did not wish to continue her relationship with him.

According to Lovett, he drove from the bowling alley to his home. His wife, Beverly, testified that she had become angry with ... Lovett when he did not return home at 11:30 and was still awake when he returned shortly after 2:00. Her testimony indicates that [Lovett] returned home within 5 to 10 minutes after the hour of 2.

Debbie Guster was driven to her home by a male acquaintance at the bowling alley, arriving at approximately 2:45 A.M. At that time, upon entering the home, she discovered the body of Linda Colby, called the police, and informed them when they arrived that ... Lovett had been in the home at approximately 1:00 A.M.

This led the police to go to [his] home. They arrived at the home at approximately 4:30 A.M. and took ... Lovett into custody to be transported to the police station for questioning. Lovett was advised of his *Miranda* rights and was informed that he would be questioned regarding a homicide. When the police arrived at ... Lovett's home, he came from his bedroom in a bathrobe. Upon being told to dress for the trip to the police station, ... Lovett returned to his bedroom with police officers at his side. Various articles of clothing were observed strewn around the bedroom and ... Lovett acknowledged that these were the clothes that he had worn the previous evening. The police seized these clothes, including a pair of shoes, as possible evidence and instructed ... Lovett to put on clean clothing.... Lovett subsequently gave a statement to the police denying guilt and setting forth what has been summarized above, i.e., that he was at Debbie Guster's house around 1:00

A.M., was unable to speak to Debbie Guster on the telephone at that time, drove to the bowling alley, was unsuccessful in pursuing his attempt to have a social engagement with Debbie Guster at that time, left the bowling alley at around 1:30 A.M., and drove to his home.[2]

In its July 1987 Opinion, this Court summarized the evidence that had been presented at his trial:

The trial, which led to Lovett's conviction, lasted approximately sixteen days During that time, competent proof established that (1) he was the last known person to have been at the scene of the crime prior to the incident, and (2) the blood on Lovett's shoes matched the blood type of the victim. Furthermore, the sweater fibers, which were found on the victim's body, matched a sweater that had been worn by Lovett during the night of the murder. In addition, the polyester fibers found on Lovett's shirt were similar in all respects to the polyester fibers which were found in the victim's brassiere.

Several witnesses also testified as to Lovett's then-recent relationships with women and the violence that had been associated in these relationships. There was also forensic testimony which matched the pubic hairs that had been found on the deceased with those obtained from Lovett. An analysis of Lovett's semen sample that had been used to determine his blood type was matched with the blood type from a vaginal swab of the victim.*

* This Court has not relied on this evidence (to wit, the pubic hairs and the semen sample) because the Michigan Court of Appeals determined that it was obtained by an unsworn search warrant. *People v. Lovett*, 85 Mich.App. 534, 538 [272 N.W.2d 126] (1978). Thus, such evidence was not the kind of competent proof or "properly admitted evidence" that can be used in responding to a prosecutorial misconduct claim. *See e.g. United States v. Hernandez*, 779 F.2d 456, 460 (8th Cir.1985); *Morgan v. Hall*, 569 F.2d 1161, 1166 (1st Cir.1978). This Court, however, mentions the evidence because it was admitted at trial.[3]

This Court will now conduct a *de novo* review of each issue that has been raised by Lovett as an objection to the Report of Magistrate Komives.[4]

## II.

### A

Lovett initially claims that he was denied his right to confrontation under the Sixth Amendment in that hearsay testimony was improperly admitted during the trial to explain the reason why a non-testifying witness failed to identify him during a police lineup. Wayne Badour, a police officer, testified about the events that preceded the police lineup, which was held for Ernest Amaro, an employee of a bowling alley where Lovett claimed to have been at approximately 1:15 a.m. on the night of the murder.[5]

Prior to the lineup, Amaro had indicated that he had seen someone at the bowling alley who resembled Lovett. Inasmuch as this testimony would have supported or impeached Lovett's alibi, the police arranged a lineup in order to determine the accuracy of Amaro's observations. Badour conceded that Amaro was not able to identify Lovett during the lineup. However, he subsequently testified that Amaro approached him at the counter of the Sheriff's Department after the lineup:

He told me at this time he was confused while he was in the lineup. He said that if ... Lovett would have had facial hair, that he could identify him as the person that he seen in the parking lot of the

---

2. Magistrate's Report at 1–5.

3. Opinion at 1130–1131. Lovett consistently denied that he was at, or near, the murder scene when the crime occurred. The asterisk has taken the place of the footnote in the original opinion.

4. Rule 8, "Rules Governing Section 2254 Cases in the United States District Courts."

5. This is also the period when Lovett asserts that he sought to speak with Deborah Guster, the owner of the home where the homicide occurred.

Stardust Lanes at 2:30.[6]

In his argument before this Court, Lovett submits that the admission of this testimony violated his rights under the Confrontation Clause.[7] However, Lovett's contention on this issue was rejected:

Despite Lovett's contention, the record indicates that the prosecutor produced Amaro but Lovett decided not to call him as a witness. Tr. Vol. X, p. 1793. Thus, Lovett clearly had the opportunity to confront his accusers but his counsel chose not to exercise that option.[8]

Nonetheless, this Court directed the Magistrate to determine whether (1) Lovett was consulted by his counsel regarding the decision to waive this form of confrontation and (2) the failure to call Amaro was trial strategy.

■ In his objections to the Magistrate's Report, Lovett posits this Court and the Magistrate have misconstrued the Confrontation Clause problem:

The fact that ... Badour testified that ... Amaro could not identify ... Lovett at a lineup was not based on hearsay. He was not testifying as to something that ... Amaro said, but rather to a nonstatement by ... Amaro. Therefore, the [trial] court should not have allowed ... Badour to explain what ... Amaro had said to him. (See, Memorandum of Law 37–8). This denial of the right of confrontation should not have placed ... Lovett in the position of having to either not establish a nonidentification or establish a nonidentification and thus open the door to hearsay testimony. If the prosecutor had wanted the jury to know why ... Amaro could not identify ... Lovett, then the prosecutor was free to call ... Amaro. This was not done. Therefore, ... Lovett was denied his right of confrontation.[9]

There are several problems with Lovett's analysis. First, the statement (to wit, "the

[trial] court should not have allowed ... Badour to explain what ... Amaro had said to him....") omits one key point. Significantly, Lovett agreed to let Badour explain his answer. Although initially expressing a desire not to hear any explanation, the following exchange occurred between the trial judge and Lovett's counsel:

THE COURT: You don't want him to explain?

LOVETT'S ATTORNEY: Oh, I want him to explain, your Honor, I will have him explain.[10]

This clearly demonstrates that Lovett ultimately withdrew his objection to having the officer offer an explanation. Hence, the trial court did not act over any formal objection. In fact, there was a concession by Lovett on this evidentiary issue.

**B**

Lovett next complains that Badour's explanation left him in the difficult position of doing nothing or attempting to counter the potentially damaging testimony by "establish(ing) a nonidentification and thus open(ing) the door to [more damaging] hearsay testimony."[11]

This argument has flaws that are similar to the preceding claim. Lovett ultimately expressed no objection to Badour's explanation. Moreover, he failed to register an objection even after it had been presented to the jury. In other words, Lovett's professed predicament was of his own making —not a creation of the prosecutor or the Court. By not making any objection to this testimony, Lovett waived any violation of his Constitutional rights under the Confrontation Clause.

Moreover, the transcript clearly suggests that Lovett's decision with regard to this issue was a very deliberate trial strategy. Lovett initiated the questioning regarding a man who was later seen at the bowling alley in search of Debbie Guster in an ostensible effort to gain support for his

---

**6.** Tr. Vol. VII, p. 1291.

**7.** The prosecutor also presented evidence that Lovett had facial hair at the time of his arrest.

**8.** Opinion at 1134.

**9.** Objections at 4.

**10.** Tr. Vol. VII, pp. 1291–1292.

**11.** Objections at 4.

alibi defense. Presumably, Lovett believed that the failure of Amaro to identify him in the lineup would bolster his claim that some other person committed the offense. However, once Badour testified about his post-lineup conversation with Amaro, Lovett's counsel, purposefully chose not to call this key witness. During the evidentiary hearing before the Magistrate, he said:

> I was afraid from ... Badour testifying there that he might come in the courtroom and make an in-court identification. And I didn't want to run the risk of him doing that. I had that happen to him before where you can't recognize at the lineup, but when they walk into court, that's the one.... I didn't want to raise a big fuss ... I didn't want to highlight it before the jury.[12]

Thus, he did not object to the Badour testimony because of his fear that the Government would call Amaro. Instead, he attempted to discredit Amaro through Badour, by pointing out that (1) Amaro had not made any identification at the lineup, and (2) the lighting in the parking lot, as well as Amaro's distance, on the night of the alleged sighting made his recollection suspect. Clearly, Lovett's counsel deliberately chose this impeachment approach rather than to risk having Amaro called as a witness for the defense.

There are several reasonably factually similar cases in which the courts held that the strategic choice of trial counsel not to confront a witness constituted a waiver of any Confrontation Clause claim. One such case is *United States v. Rundle*, 285 F.Supp. 625 (E.D.Pa.1968), in which the Defendants had been charged with the rape of two women. During the trial, a detective recalled incriminating statements that had been made to him by one of the Defendants who placed another Defendant, Herbert Cornitcher, at the scene of the crime. However, Cornitcher did not object to the hearsay nature of the detective's testimony

because it contained evidence that tended to support his defense (to wit, the sexual contact was consensual). A guilty verdict was returned. Following an exhaustion of his state appellate rights, Cornitcher's subsequently filed application for Habeas Corpus was denied by the federal court which held that any Confrontation Clause violation had been waived:

> The important thing is that the *right* was waived; the *ground* upon which the right rested is, to us, unimportant. Cornitcher's counsel as part of his trial strategy, wanted the co-defendant's statement in evidence. It was the only apparent way of getting the defense of consensual intercourse before the jury without exposing his client to cross examination.[13]

In *Poole v. Fitzharris*[14], the Defendant waived the production of the prosecution's witnesses and agreed to the submission of the preliminary hearing transcripts in lieu of the witness' personal appearances. After being found guilty, the Defendant complained on appeal that the trial court had erred in allowing this evidence to be presented to the jury. The Ninth Circuit Court of Appeals rejected this argument, finding that the Defendant had waived his Sixth Amendment claim:

> [I]n the proper circumstances, counsel for the accused may waive certain rights of the accused during his representation of the accused and as a matter of trial strategy or tactics.[15]

In addition, the *Poole* court found that the Defendant had made an effective waiver of his Constitutional right under the Sixth Amendment even though his trial counsel had not advised him of the significance of the admission of the preliminary hearing transcript testimony into the record.

The instant case is even stronger than *Poole* on the waiver issue. In *Poole*, the

---

**12.** Evidentiary Hearing Tr. at 10–11.

**13.** *Id.* at 678.

**14.** 396 F.2d 544 (9th Cir.1968).

**15.** *Id.* at 546, *quoting Wilson v. Gray*, 345 F.2d 282, 288–89 (9th Cir.), *cert. denied*, 382 U.S. 919, 86 S.Ct. 288, 15 L.Ed.2d 234 (1965).

Defendant waived his ability to cross examine *any* of the witnesses of the prosecution. Here, Lovett only waived the opportunity to question *one* adverse witness. Thus, if a defendant possesses the authority to virtually waive any cross examination, he certainly has the right to relinquish his right to call one witness, especially given his strong reasons for doing so.

It should be noted that there is some tension between *Poole* and *Palfy v. Cardwell.*[16] In *Palfy*, the Defendant stipulated to the admission of certain facts into the trial record. However, unlike *Poole*, the Defendant in *Palfy* expressed his approval to the subsequent action by his counsel.[17] Following an adjudication of guilt and an exhaustion of his state appellate remedies, the Defendant in *Palfy* unsuccessfully sought to persuade the district court in a habeas petition that he had never intelligently waived his confrontation rights. The Court of Appeals for the Sixth Circuit, acting upon appellate review, affirmed and concluded that he had waived his Constitutional right after holding:

> The Sixth Amendment provides that in criminal prosecutions, the accused shall have the right to be confronted with the witnesses against him. And unless an accused person actually waives that right, this constitutional guarantee has been violated. *Brookhart v. Janis*, 384 U.S. 1 [86 S.Ct. 1245, 16 L.Ed.2d 314 (1966)].[18]

At first glance, *Palfy* appears to suggest that any confrontation clause waiver must be made with the consent of the accused ("unless an accused person *actually* waives that right ..."). Certainly, such a rigid interpretation would be in tension with *Poole*. In addition, such an overly simplistic view of *Palfy* would be contrary

to Supreme Court precedent as well as common sense.

■ In *Henry v. State of Mississippi,*[19] *the Supreme Court held that:*

> Although trial strategy adopted by counsel without prior consultation with an accused will not, *where the circumstances are exceptional,* preclude the accused from asserting constitutional claims, see *Whitus v. Balkcom*, 333 F.2d 496 (5th Cir.1964), we think that the deliberate bypassing by counsel of the contemporaneous-objection rule as a part of trial strategy would have that effect in this case.

Thus, the general rule, which must be applied when interpreting *Palfy*, is that a defendant's failure to object usually constitutes a waiver even "without prior consultation with an accused" unless "the circumstances are exceptional." [20]

■ Significantly, *Palfy* relied upon *Brookhart v. Janis,*[21] in which the Court held that a defense counsel lacks the "power to enter a plea which is inconsistent with his client's expressed desire and thereby waive his client's constitutional right to plead not guilty and have a trial in which he can confront and cross-examine the witnesses against him." Thus, a defense counsel cannot waive his client's rights when the waiver involved has the effect of a plea of guilt. Under these circumstances, a client's consent is necessary. Moreover, under the *Palfy* standard, a client's consent may be necessary when material facts are agreed upon before trial. In the instant case, a waiver can occur even without consent since the decisions as to whether or not to object or call witnesses are those of trial counsel.[22] Common sense dictates such a result. During any crimi-

---

**16.** 448 F.2d 328 (6th Cir.1971).

**17.** *Id.* at 330.

**18.** *Id.* at 332.

**19.** 379 U.S. 443, 451, 85 S.Ct. 564, 569, 13 L.Ed.2d 408 (1965). (Emphasis added).

**20.** In *Henry,* the court remanded for a determination as to whether the Petitioner's counsel

had deliberately waived certain objections because the record was unclear on that issue. By contrast, the evidentiary hearing in this case reflects a deliberate waiver. Thus, no remand is necessary here.

**21.** 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).

**22.** *United States v. Stephens,* 609 F.2d 230, 233 n. 2 (5th Cir.1980).

nal trial, every defense counsel faces a vast number of discretionary decisions, which include, among other things, whether to object to adverse testimony and how to cross examine a witness. Every such decision conceivably involves the Defendant's Confrontation Clause rights. If our courts required a defense lawyer to obtain his client's consent prior to making any such decisions, then the client—not the attorney—would be the responsible person for the conduct of a trial. Under such circumstances, the supposed expertise of a defense counsel would be totally hamstrung, and a defendant would likely do more harm than good and few attorneys would accept the challenge of a trial.[23]

■ Thus, for all of these reasons, a defense counsel cannot surrender the fundamental right to maintain a position of innocence without his client's express consent. However, as these authorities indicate, a trial counsel can unilaterally waive certain confrontation claims by deciding not to object to certain testimony or electing not to call witnesses if such decisions are based upon reasonable trial strategy.[24] Thus, Lovett's actions, through his counsel, constituted a waiver of any Confrontation Clause rights that he may have possessed under the *Palfy* and *Henry* standards. Even if his claim had not been waived, any error was harmless beyond a reasonable doubt given the strength of the other evidence which tied Lovett to the offense with which he had been charged and the obvious problems with the reliability of the Amaro testimony.[25]

## C

■ Lovett also contends that his attorney's failure to challenge the Amaro testimony constituted an ineffective assistance of counsel. In *Strickland v. Washington*,[26] the Supreme Court adopted a two part test for determining whether ineffective assistance has occurred. First, the Petitioner must show that his counsel's performance fell "below an objective standard of reasonableness [under] prevailing professional norms."[27] Second, the Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[28] The Court also opined that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[29]

Moreover, the court in *Strickland* held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable."[30] One lower court has determined that "decisions relating to a reasoned choice of trial strategy and tactics are not cognizable in a federal habeas corpus proceeding."[31] Such strategic choices are the general prerogative of counsel.

Despite the strong presumption favoring competence, the decisions of trial counsel which "betray a startling ignorance of the law—or a weak attempt to shift blame for inadequate preparation" do not satisfy the requisite professional standards.[32]

**23.** *Nelson v. People of State of California,* 346 F.2d 73, 81 (9th Cir.1965).

**24.** The Eighth Circuit Court of Appeals in *United States v. Stephens,* 609 F.2d 230, 232 (5th Cir. 1980) described *Palfy* as standing for the proposition that "where the defendant does not object, counsel may, as a matter of trial tactics, waive the right to confront and cross-examine witnesses." Lovett evidenced no objection in this cause.

**25.** *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

**26.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**27.** *Id.* at 688, 104 S.Ct. at 2065.

**28.** *Id.* at 697, 104 S.Ct. at 2069–2071.

**29.** *Id.* at 690, 104 S.Ct. at 2066.

**30.** *Id.* at 690, 104 S.Ct. at 2066.

**31.** *Comer v. Paratt,* 674 F.2d 734, 737 (8th Cir. 1982). *Cf. Sanchez v. United States,* 782 F.2d 928 (11th Cir.1986).

**32.** *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 2588–89, 91 L.Ed.2d 305 (1986); *Blackburn v. Foltz,* 828 F.2d 1177, 1182 (6th Cir.1987); *Lyons v. McCotter,* 770 F.2d 529 (5th Cir.1985).

Based on these standards, this Court cannot say that the efforts of Lovett's trial counsel to show that someone else had been seen at the bowling alley in search of Debbie Guster falls below the prevailing professional norms for competent trial counsel. His only defense was based on the strength of his alibi. Neither the failure of this line of questioning to support his alibi defense nor the handling of the matter by trial counsel subsequent to the incriminating statement by Badour constitute ineffective assistance. The choice not to call Amaro was quite deliberate and reasonable under the circumstances.

**D**

■ Lovett also alleges that his counsel's failure to consult with him regarding the strategy of not calling Amaro constitutes ineffective assistance of counsel.[33] At first glance, there would appear to be some conflict in the record as to whether any consultation occurred. The following colloquy between Magistrate Komives and Lovett's former attorney occurred during the evidentiary hearing:

THE COURT: Was Mr. Lovett consulted by you prior to deciding not to require Amaro's production?

A: Yes, I said you don't want him. I didn't know why you would want a man that's going to put you somewhere other than the alibi. It would be foolish.[34]

Later, the following exchange developed when Lovett was being questioned by his new attorney:

Q: Did he ever discuss with you the strategy of his handling the witness or potential witness Amaro?

A: There was no discussion whatsoever concerning Mr. Amaro.[35]

A close reading of the two interpretations shows very little conflict. Such a reading confirms that Lovett's counsel never sought his client's viewpoint or presented him with any viable trial strategy options with regard to the Amaro issue. Nonetheless, this Court finds that the objective standard of reasonableness in performance, as required by *Strickland,* was not violated. *Strickland* and *Kimmelman* make clear that an attorney's courtroom performance need not be mistake free or even excellent. It need only be reasonable. One aspect of this standard is that the trial lawyer must at least "make the adversarial testing process work in the particular case." [36]

This Court concludes that the lack of consultation between Lovett and his trial counsel did not fall below reasonable levels of *Strickland* because it did not affect the adversarial process. Given the strength of counsel's convictions about not calling Amaro, it is clear that Lovett would not have swayed him otherwise. Moreover, this kind of decision is not akin to a plea of guilty where consultation and consent is needed. It is a basic tactical decision that does not justify the granting of habeas relief.[37] In addition, there is no indication that Lovett ever expressed any problems with his counsel's decisions during the course of the trial.

Ideally, a criminal trial counsel should consult extensively with his client regarding important strategic decisions in cases wherever possible.[38] However, under the circumstances of this controverted issue, this Court concludes that Lovett has failed to establish that his attorney's conduct satisfied the first prong of *Strickland.*[39]

---

**33.** This Court will assume, *arguendo,* that this claim is merely a variation of his legal theory that was presented in the habeas petition and, thus, cognizable here. *Prather v. Rees,* 822 F.2d 1418, 1421 (6th Cir.1987). The issue of whether Lovett was consulted differs from the issue of whether he consented discussed *supra.*

**34.** Evidentiary Hearing Tr. at 11.

**35.** Tr. at 77.

**36.** *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066.

**37.** *See generally Maynor v. Green,* 547 F.Supp. 264 (S.D.Ga.1982).

**38.** *United States v. Moore,* 529 F.2d 355, 358 (D.C.Cir.1976).

**39.** *In United States v. Rhoads,* 617 F.2d 1313 (8th Cir.1980), the court found that there was no ineffective assistance of counsel even though the Defendant's trial counsel disregarded the direct wishes of his client regarding the presentation of a particular defense.

### III.

▮ In its July 31, 1987 Opinion, this Court required the Magistrate to examine Lovett's allegations that the trial judge had impermissibly curtailed the cross examination of Deborah Guster regarding her alleged bias. However, after questioning Lovett's former counsel, the Magistrate concluded that there was no evidence to support Lovett's allegation that she had received prosecutorial favors in her custody case. Hence, he opined that the curtailment of the cross examination of Deborah Guster did not constitute a Confrontation Clause violation.[40]

In his objections to the Report of the Magistrate, Lovett argues that, since his counsel conceded at the evidentiary hearing that this questioning of Guster was a "fishing expedition," this supports the ineffective assistance argument. Supposedly, this concession by the trial counsel reflects his level of unpreparedness. This Court disagrees. Although desirable, a defense counsel cannot be expected to know the answer to *every* question that he asks. The fact that Lovett's trial counsel pursued a potential conflict of interest through vigorous questioning demonstrates effective legal assistance above all—not ineffective assistance. Certainly, this questioning caused no harm to Lovett's defense.

### IV.

On July 31, 1987, this Court directed the Magistrate to determine whether the failure of Lovett's trial counsel to make a motion to suppress all of his prior convictions[41] constituted ineffective assistance. Thereafter, the Magistrate opined that Lovett's defense counsel (1) had a correct understanding of the law regarding prior convictions at the time of trial, (2) relied on his belief that the trial judge would have suppressed the evidence, and (3) informed Lovett of his plan to expose the jury to the criminal record before the prosecution had

an opportunity to do so. The Magistrate finally concluded that the decisions of Lovett's defense attorney were trial strategy and did not constitute an ineffective assistance of counsel. He believed that any error was harmless because two non-assaultive crimes would not have affected the verdict.

Lovett objects to these findings by the Magistrate, asserting that his defense counsel had an obligation to file a suppression motion to preserve the issues for appeal. He supports this legal incompetence argument by quoting from trial counsel's testimony at the evidentiary hearing:

> I do not do appeal work. I never have. I refuse to do appeal work because of the fact you have to find fault with yourself, and I have to find fault with myself.[42]

Lovett also contends that the defense attorney (1) was not aware that prior criminal *sentences* were not admissible at the time of trial and, as such, allowed the jury to learn of his probationary status, (2) should not have assumed that the judge would deny his suppression motion, and (3) did not obtain his consent to this strategy.

▮ As a preliminary matter, the Court notes that the decision of Lovett's defense counsel not to object to the admission of *prior sentences* was based on a startling ignorance of the law, and, thus, does not meet professional standards. In *People v. Nelson White,*[43] the Court made clear that prior sentences were not admissible. Clearly, Lovett's counsel should have been aware of this case law. Thus, his decision to "bare the soul" of the Defendant on this point[44] unnecessarily brought in damaging evidence and indirectly informed the jury of the prior convictions.

The prior convictions issue is more difficult. At the evidentiary hearing, trial counsel did show a basic familiarity with the relevant case principles. In fact, he

---

**40.** The Magistrate also held that any violation would have been a harmless error.

**41.** Lovett's prior convictions were for Breaking and Entering, as well as Attempted Breaking and Entering.

**42.** Evidentiary Hearing Tr. at 48.

**43.** 26 Mich.App. 35, 181 N.W.2d 803 (1970).

**44.** Evidentiary Hearing Tr. at 50–51.

displayed a fairly accurate understanding of the law [45] during the evidentiary hearing before the Magistrate in which the following colloquy occurred:

> THE COURT: Did he have prior convictions that would be used for impeachment?
>
> A: He did, but they were not assaultive in nature. And under the statute, of course, where Defendant takes the stand, the general rule is that you can use prior records to impeach his credibility. It was more probative than it is prejudicial, and— [46]

■ The Magistrate apparently felt that any trial strategy could not constitute ineffective assistance.[47] However, this is not a legally sufficient basis upon which to make such a conclusion. This Court must still determine if the strategy was, or was not, "outside the wide range of professionally competent assistance." [48]

The "baring the soul" strategy cannot be justified *if* the trial counsel had a legal basis for excluding the damaging material. If it was inevitable that the law would have provided a basis for the admission of the evidence into the record, it would have been quite prudent for a defense counsel to have "elected" to introduce the evidence before the prosecutor.

■ However, given such an obvious chance to get this material excluded, any prudent trial counsel must file such a suppression motion. Under a "worst case" scenario, the Court would have denied it. Thereafter, a decision by defense counsel to voluntarily introduce such damaging information would have been reasonable. The failure to at least seek suppression falls below reasonable levels of competence. In addition, it waives any right of appeal on that issue.

In *Blackburn v. Foltz*,[49] the Court of Appeals for the Sixth Circuit concluded that the failure of the petitioner's trial counsel to move for the suppression of a prior conviction constituted a basis for a finding of ineffective assistance of counsel. Blackburn's counsel believed that impeachment was inevitable since his client had intended to testify. The Court concluded that the defense counsel had misunderstood the law regarding prior convictions. Similarly, a decision by Lovett's counsel in this case to bare his client's soul and to reveal his criminal past without making any effort to prevent its admission by the prosecution does not meet the minimum standards of reasonable professional competence.[50]

The facts of the instant case are also analogous to those in *Lyons v. McCotter*.[51] In *Lyons*, the court found that the defense counsel's failure to sufficiently object to the scope of the prosecution's cross examination regarding prior convictions fell below the acceptable level of competence.[52]

The fact that the judge may have been personally disinclined to grant the motion does not obviate the obvious—that Lovett had nothing to lose from presenting the issue to the Court for a decision. Moreover, one must presume that the trial judge would rule according to law and not on the basis of a person predilection. Given the great discretion that state trial judges have

---

**45.** *People v. Hughes,* 411 Mich. 517, 309 N.W.2d 525 (1981); *People v. Jackson,* 391 Mich. 323, 217 N.W.2d 22 (1974).

**46.** Evidentiary Hearing Tr. 13–14. *See also* Tr. at 48.

**47.** Magistrate's Report at 11 ("attorney Fox's deliberate elicitation of the prior conviction constituted trial strategy and not ineffective assistance of counsel").

**48.** *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *Martin v. Rose,* 744 F.2d 1245, 1249 (6th Cir. 1984).

**49.** 828 F.2d 1177 (6th Cir.1987).

**50.** *But see Kimmelman v. Morrison* (a failure to file a suppression motion "does not constitute *per se* ineffective assistance of counsel." The totality of the decision must be examined), 477 U.S. 365, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986).

**51.** 770 F.2d 529 (5th Cir.1985).

**52.** In contrast to the instant case, Lyon's counsel did make an effort—albeit unsuccessful—to preclude the admission of his client's prior criminal record by the filing of a motion in limine. *Id.* at 531 n. 3.

under Michigan law, it is possible—perhaps, not probable—that the motion would have been granted.

## V.

### A

Lovett contends that the trial counsel's failure to object to the questions by the prosecutor relating to his post-*Miranda* silence [53] constitutes ineffective assistance of counsel. In particular, he cites the following exchange during the trial:

Q. And what does that—what did you tell Mr. Lovett on January 23rd with respect to waiver?

A. He was asked if he understood each of the rights that had been explained to him; and having the rights in mind, did he wish to speak to us now.

Q. Mr. Lovett was asked this?

A. Yes.

Q. And in your presence, did he indicate a response?

A. Not that I can recall.

Q. All right. Did he indicate that he heard the rights?

A. Yes.

Q. Okay. Did he say that he understood them and wishes to make a statement, or did he just—

A. He didn't say that he wanted to make a statement or anything.[54]

Although no objection was made by Lovett's counsel to this line of questioning, "the prosecutor neither examined [Lovett] regarding his post-*Miranda* silence nor did he make any reference to Lovett's invocation of his *Miranda* rights during the closing argument." [55] Moreover, the judge gave an instruction regarding the Defend-

ant's right to be silent and the trial counsel mentioned this right at the closing argument as well.

In its earlier decision, this Court held that the prosecutor's brief questions of the officer were "not referred to by the prosecutor to infer guilt." [56] Thus, there was no violation of *Doyle v. Ohio*,[57] which held that a defendant's post-arrest silence may not be used to impeach his exculpatory story. Such an effort would constitute an improper use of the accused's right to silence, and would represent a due process violation which would be separate from the ineffective assistance issue.

In order to resolve the issue, this Court must reevaluate its Order of July 31, 1987 by initially examining the effect, if any, of *Greer v. Miller*,[58] in which the Supreme Court revisited the *Doyle* issue.[59] In *Greer*, the prosecutor began his cross examination of the Defendant as follows:

Q. Mr. Miller, how old are you?

A. 23.

Q. Why didn't you tell this story to anybody when you got arrested? [60]

Four members of the Court opined that *Doyle* was inapposite, in that the Constitutional violation in *Doyle* occurred when the post-arrest silence was used against him for impeachment purposes. Justice Powell wrote in *Greer* that:

The trial court in this case did not permit the inquiry that *Doyle* forbids. Instead, the court explicitly sustained an objection to the only question that touched upon Miller's post arrest silence. No further questioning or argument with respect to Miller' silence occurred, and the court specifically advised the jury that it

---

**53.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**54.** Tr. Vol. V, pp. 871–872.

**55.** Memorandum Opinion at 1132.

**56.** *Id.*

**57.** 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

**58.** — U.S. —, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987).

**59.** *Doyle v. Ohio, supra.* The *Greer* decision was handed down only a few weeks prior to the earlier decision by this Court. *Greer* has no ineffective assistance claim. The defense counsel promptly objected to the introduction of his client's statements after being "Mirandized."

**60.** *Id.* at ——, 107 S.Ct. at 3105. The "story" referred to Miller's claim that he did not participate in the crime.

should disregard any questions to which an objection was sustained. Unlike the prosecutor in *Doyle*, the prosecutor in this case was not "allowed to undertake impeachment on" ... Miller's silence ... The fact of Miller's post-arrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no *Doyle* violation occurred.[61]

The instant case is even stronger than *Greer* for finding no *Doyle* violation. First, the prosecutor's question here did not attack Lovett's veracity unlike the very skeptical question in *Greer* ("why didn't you tell this story to anybody when you got arrested?"). Here, the officer was asked if Lovett had said anything after being arrested. Second, the questions were addressed to the officer—not to Lovett. This would have made any impeachment less direct and damaging. Third, like *Greer*, the judge ultimately gave a limiting directive to the jury about Lovett's right to be silent. However—unlike *Greer*—the defense counsel in this case failed to object to the question. Nevertheless, given the isolated nature of this reference in the midst of a lengthy trial, the neutral nature of the question, and the judge's cautionary instruction, this Court believes that there was no *Doyle* violation under the Powell standard.

Justice Stevens, who provided the fifth vote in *Greer*, stated that simple *Doyle* errors in habeas corpus proceedings do not justify a reversal of a conviction on a collateral attack unless the *Doyle* errors caused a "fundamental unfairness" to the Defendant.[62] Thus in Stevens' view—that which may constitute a reversible *Doyle* error on direct appeal may be insufficient to reverse a state conviction on collateral attack. Therefore, the isolated references to Lovett's silence in this case certainly do not reach the kind of fundamental unfair-

ness which Justice Stevens would require. Moreover, he would not find any prosecutorial misconduct under his standard.

■■■■ This Court concurs and concludes that no "prosecutorial misconduct" has occurred in this case which would rise to the level of a due process violation. Although the prosecutor's question arguably ventured into an area which should not have been explored, this isolated neutral question did not come close to depriving Lovett of his right to a fair trial.[63]

## B

■■■■ As discussed at some length earlier,[64] the Court must now examine the first prong of *Strickland* in order to determine whether the failure of Lovett's trial counsel to object fell below reasonable professional norms. The Magistrate held there was no ineffective assistance of counsel in part because Lovett's attorney testified that he pointed out to the jury during his closing argument that the petitioner had absolutely no obligation to speak to the police and the jury was given a similar instruction by the judge.[65] He also testified during the evidentiary hearing that he deliberately failed to object because his client had a constitutional right to remain silent and the judge instructed the jury to that effect.[66]

In his objections to the recommendations of the Magistrate, Lovett notes:

[I]t is common sense that if the defense attorney had not allowed the references to have been made, he would not have had to explain to the jury that the jury could not use Mr. Lovett's silence against him.[67]

This objection appropriately points out that the quality of a judge's instruction does not excuse a defense counsel's failure to fully protect the interests of his client.

---

**61.** —— U.S. at ——, 107 S.Ct. at 3108.

**62.** *Id.* at ——, 107 S.Ct. at ——.

**63.** *Stumbo v. Seabold,* 704 F.2d 910 (6th Cir. 1983); *Greer, id.* —— U.S. at ——, 107 S.Ct. at ——.

**64.** *Supra* at 1134.

**65.** Magistrate's Report at 11.

**66.** Evidentiary Hearing Tr. at 54.

**67.** Objections at 8.

In *Alston v. Garrison*,[68] the court stated that "few mistakes by criminal defense counsel are so grave as the failure to protest evidence that the defendant exercised his right to remain silent." This certainly demonstrates that Lovett's failure to object fell below that wide range of competence which is normally recognized by the courts.[69] *Alston* and *Doyle* both emphasized that trial references to a defendant's post-*Miranda* silence raise unique problems, especially when the major defense is alibi. These decisions noted that such commentary may cause a jury to question the reasons, if any, of an accused's failure to inform the police of his alibi immediately after an arrest. Given the case law and trial counsel's failure to state a reasonable strategic basis for his failure to object, this Court must conclude that his inaction fell below the standards within the first prong of *Strickland*.

## VI.

■■■ As an additional ground in support of his ineffective assistance of counsel argument, Lovett contends an objection should have been registered to the series of questions which involved his alleged lack of cooperation and the ostensible cooperation of Sovey with regard to certain blood and hair tests.

This Court has already determined that the isolated references to Sovey's cooperation and the Lovett court order did not constitute prosecutorial misconduct because they were not "so egregious as to render the entire trial fundamentally unfair." [70]

In addressing this issue, the Magistrate also found there was no ineffective assistance. He opined that the trial judge would have been obliged to deny any objection to this testimony by Lovett. The Magistrate reasoned that:

Part of the defense theory was that Sovey was with the victim the night of her death and could have been the perpetrator. Sovey's voluntary submission to sample testing was elicited to bolster Sovey's credibility, not solely to prejudice petitioner.[71]

Lovett correctly objects that this reasoning is faulty because the evidence at the crime scene showed that Sovey did not have the secretor chracteristics of the criminal. Thus, the defense theory would have been totally inane if it had been based solely on discrediting someone who could not have committed the crime.

However, it should be noted that the trial counsel's theory was much broader than the summary which was given by the Magistrate or advanced by Lovett. It is readily apparent from a reading of the entire record that Lovett's trial counsel felt that (1) some friends of Sovey's may have committed the crime and (2) Sovey was attempting to hide the identity of these friends. Thus, it is apparent that this defense counsel interrogated Sovey in an attempt to portray Sovey as an individual, who would purposefully hide the identity of these friends. In explaining his trial strategy, he said:

I was trying to make out at this particular time there were other people that could have done this horrendous crime. Mr. Sovey being one. And my main objective was to [show that there was evidence that Mr. Sovey had spent from six o'clock to twelve o'clock at night with the babysitter himself who is a fifteen year old girl, and they smoked pot. And Mr. Lovett shows up on the scene about one o'clock, 1:10, and it was my basic interest to show that Mr. Sovey was a dope smoker, smoking pot with a fifteen year old girl. He could have told *some of his friends* very easily there is a fifteen year

---

**68.** 720 F.2d 812, 816 (4th Cir.1983).

**69.** This Court has already held that the reference to silence was not fundamentally unfair under the particular facts of this case. This Court also quoted *Alston* to show how universal is the view that trial counsel should object to such references.

**70.** *Cook v. Bordenkircher,* 602 F.2d 117, 119 (6th Cir.), *cert. denied,* 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979).

**71.** Magistrate's Report at 12.

old girl over at that house. Why don't you go over and have a little fun. I don't know what went on. My basic theory was to show not only Mr. Sovey could have done it, but there were others. And that was my primary consideration.[72]

Later, Lovett's trial counsel spoke of Sovey:

> He was smoking pot. He is a pot smoker. So those people usually stick together. Maybe he had a little more pot that night and *sent a friend into the house* and told them there was a mark back at the house. My intention was to show that Mr. Sovey didn't do it. Others would be—could have done it. Could have been other people, and this little girl in there, she said she hid in the closet.[73]

Indeed, there was also evidence that Deborah Guster had other male callers. Given the strong incriminating nature of the evidence, it was not an unreasonable trial tactic for Lovett's trial counsel to attempt to show that neither Sovey nor his friends were reputable or credible. Under these circumstances, it is quite probable that the trial judge would not have granted any objections to testimony which bolstered Sovey's credibility. Consequently, this Court concludes that Lovett's trial counsel's failure to object did not fall below reasonable norms of conduct. The actions of the trial counsel indicate that he was attempting to persuade the jury that some unidentified person could have committed the crime with which Lovett had been charged. This would have been the perfect complement to Lovett's alibi defense.

### VII.

In its earlier Opinion, this Court concluded that the prosecutor had not engaged in misconduct during the trial. This Court stated that:

In every cited example of alleged misconduct by the prosecutor, the record reveals that the evidence about which Lovett complained came through the testimony of witnesses as opposed to direct comment. He has failed to demonstrate any prejudice as the result of commentary by the prosecutor. In many instances, the prosecutor had merely cross-examined a defense witness concerning evidence that had been brought out on direct testimony.* Lovett's extra-marital affairs were not repetitively or unnecessarily dwelled upon. His conflicting statements about these affairs were revealed for the purposes of impeachment. In his closing argument, the prosecutor properly summarized only the facts in evidence and their relationship to his theory of the case.

---

* As an example, in response to an objection from Lovett's counsel, the trial judge stated: "Well, there were questions put to him on direct about his relationship with his wife, Mr. Fox, and I have to allow the Prosecutor a chance to cross examine." Tr. Vol. XIII, p. 2401. Lovett's counsel asked his client if he was a violent man. Lovett responded in the negative. Tr. Vol. XIII, p. 2396. During the cross-examination which immediately followed, the prosecutor inquired "you do recall giving your wife a black eye before you got married, though, right?" The prosecutor's questions to Lovett's wife about her husband's indiscretions, Tr. Vol. XII, p. 2172–2180, and his relationship with Deborah Guster, Tr. Vol. XIII, p. 2455, had been raised during the direct examination.[74]

█ In addressing the question of whether the controversial "bare the soul" strategy of Lovett's trial attorney constitutes ineffective assistance of counsel, the Magistrate concluded that this trial approach did not fall below the minimum standards of professional legal conduct.[75]

He initially opined that evidence which showed that Petitioner had slapped Deborah Guster on at least one prior occasion

---

72. Evidentiary Hearing Tr. at 17 (emphasis added).

73. *Id.* at 32 (emphasis added).

74. Memorandum Opinion at 1131. The asterisk has taken the place of the footnote in the original opinion.

75. Trial counsel testified during the hearing before the Magistrate that he obtained this strategy from a book, *How to Win Criminal Cases by Establishing a Reasonable Doubt,* by David Cohen. He also spoke of his extensive criminal case experience in Saginaw County, which included a number of years as a prosecutor.

was admissible to establish their relationship:

It was the prosecutor's theory that petitioner was acting out of lust and anger when he returned to Debbie Guster's house after being rebuffed by her at the bowling alley. The history of the relationship, and the reasons underlying Debbie Guster's rebuff of petitioner, both explained her action and tended to show why petitioner was consumed by lust and rage.[76]

The Magistrate also held that neither the testimony of Beverly Lovett regarding the slapping incident nor the anger which she displayed at her husband's infidelity could be deemed to be inadmissible. She was his entire alibi. As Lovett's trial counsel stated at the evidentiary hearing:

Q. Was there strategic reasons for that?

A. Yes.

Q. What was that?

A. One thing I have a very tenuous situation here. I have a wife here I was trying to get her cooperation, and she was right on the fence. She was aware of the fact of this relationship with Deborah Guster.

Q. Did eliciting this in front of the jury help you in terms of your relationship with his wife as a potential witness?

A. Yes, that's the truth. She was a very sore—she ran in my office one day and ran into the police department the next.

Q. Your testimony is the strategy was to make it easier for you with Deborah?

A. Yes, I had to have her alibi. I needed her. She might have felt this was a cover-up, and she told me we weren't covering up anything.[77]

The trial counsel also testified that one purpose in having Lovett admit his extramarital activities was to demonstrate that he did not have to sexually assault young girls because of these other outlets for his needs.[78]

Lovett's major objection to the Magistrate's Report relates to the allegedly improper admission of prior bad acts testimony during the trial. Although Lovett relies upon *United States v. Hogue* [79] in support of this proposition, it is a flawed argument. In *Hogue*, the Tenth Circuit Court of Appeals examined a ruling by the trial court which admitted evidence regarding prior violent bad acts by the Defendant on direct appeal. Hogue's counsel was unsuccessful in his efforts to prevent the introduction of this evidence.

The instant case is clearly inapposite. First, this is not a direct appeal of a recent federal conviction. It is a collateral attack through the use of a federal habeas corpus petition regarding a twelve year old state conviction. Second, unlike *Hogue,* no specific prior bad act rulings of the trial court are being questioned in the instant cause. The issue here is the reasonableness of the trial counsel's decision to introduce the bad acts on the ostensible theory that the admission of this evidence was inevitable. *Hogue* simply has no relevancy on this issue.

Moreover, Lovett does not contradict his trial counsel's opinions as to the volatility of his wife or the crucial nature of motive testimony in this case. Moreover, he has not proffered any defense other than alibi. Thus, the "baring the soul" strategy on these points was certainly reasonable, although admittedly quite risky.

There is also precedent within the Sixth Circuit for such an approach. In *Charles v. Foltz,*[80] the petitioner made an unsuccessful ineffective assistance claim with some similarities to the instant case:

This claim is based on his counsel eliciting on direct examination the fact that Charles had taken mescaline, acid and other drugs, and had watched stag mov-

---

**76.** Magistrate's Report at 7.

**77.** Evidentiary Hearing Tr. 45.

**78.** *Id.* at 73.

**79.** 827 F.2d 660 (10th Cir.1987).

**80.** 741 F.2d 834, 840 (6th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 970, 83 L.Ed.2d 973 (1985).

ies. Additionally, counsel elicited from Charles the fact that he had been denied parole and escaped from prison. The appellant asserts that the cumulative effect of these disclosures allowed the prosecutor to argue that he was a man with a bad background ...

In the instant case, as the district court noted, the elicitation of this information is consistent with and not unreasonable trial strategy. Evidence of such drug use by the appellant and two companions who were key prosecution witnesses may well have been a foundation for attacking the credibility of these two witnesses. Moreover, the appellant's extensive account of his activities was consistent with a trial strategy of bolstering the appellant's credibility. Additionally, the record evinces that defense counsel performed "at least as well as a lawyer with ordinary training and skill in the criminal law ... and conscientiously protected his client's interest." *Beasley* [*v. United States*], 491 F.2d [687] at 696 [ (6th Cir. 1974) ]. Based on these factors, the district court properly found that there was no denial of effective assistance of counsel.

Lovett says that the jury unnecessarily learned that he had been divorced, committed adultery, had been sentenced to prison on prior occasions, met his current wife while in jail, and was fired from work for lying.

The major problem with Lovett's argument is that his wife apparently refused to be restrained in her testimony and, yet, she was essential to his alibi defense. Through her, the jury learned of the information about which he complains. During the evidentiary hearing before the Magistrate, Lovett's trial counsel explained that, although in desparate need for her testimony, he was unable to curtail her testimony. Ultimately, she did provide alibi testimony.

With regard to Lovett's discharge from employment for having given false information to his employer, his trial counsel argued that this misrepresentation was merely an effort by Lovett to (1) obtain a job by hiding his ignoble past from the employer, and (2) provide a means of support for his family. Although this explanation was apparently not accepted by the jury, it was not an unreasonable effort to minimize potentially damaging evidence against him.

Lovett correctly notes that his trial counsel was occasionally inconsistent with his objections. However, this was a lengthy trial. For this Court to second guess every discretionary decision by an attorney during a trial would place an extraordinarily unreasonable burden upon him. Moreover, it would constitute the kind of review that the Supreme Court prohibited in *Strickland* and *Kimmelman*. Although this Court may believe that other strategies were far more preferable (such as not having a defendant testify), the "baring the soul" strategy cannot be declared as being unreasonable in theory or in its application under the totality of the circumstances.

## VIII.

Although Lovett captions his last issue as a "failure to raise the illegality of an arrest without a warrant," he describes the error of his trial counsel as failing to object to illegally obtained evidence. These two formulations have some differences. In effect, Lovett is seeking reconsideration of an earlier decision by this Court which rejected this claim. Pursuant to Local Rule 17(m)(3) of the Eastern District of Michigan, he must demonstrate that the Order, to which he takes an exception, contained a "palpable defect" whose correction would result in a difference decision. This motion must be rejected. Lovett cannot meet this Local Rule 17(m)(3) burden or even the more standard burden when a motion is not on reconsideration. In addition, his motion is untimely, in that more than ten days have elapsed since the entry of the Order.

In its earlier Opinion, this Court held: [Lovett's] last ground for ineffective assistance of counsel is based upon his trial counsel's failure to object to illegally obtained evidence. This ground must be rejected. Lovett's counsel filed a Motion in Limine to suppress the admission of his client's clothing as evidence which

was denied on May 27, 1975. Moreover, the Michigan Court of Appeals determined that certain evidence had been illegally obtained but excluded that material from its decision.[81]

■ As this Court indicated, the failure of Lovett's trial counsel to object at trial on this issue did not constitute ineffective assistance of counsel since he had already been unsuccessful in a previously filed motion to suppress regarding the same matters.

In his objections, Lovett argues:
The Court rejected the claim of ineffective assistance for failure to make a pretrial motion to suppress on the basis of the illegal arrest. The court's ruling was based on the fact a pre-trial motion was raised. However, the ground raised was not the failure to have a warrant or exigent circumstances. The crucial evidence seized at the time of arrest were the shoes, which the state courts relied upon in determining the other error was harmless. Thus, counsel's failure to raise the issue was ineffective assistance.[82]

These assertions are not correct. As the transcript of the trial judge's ruling makes clear, the ground which was raised in the Motion to Suppress was the failure to have a warrant.[83] Moreover, Lovett emphasizes that the evidence relating to his shoes was crucial and suggests that any motion to suppress did not include or incorporate this narrow issue. This contention is also not correct. Indeed, the order, which was denied by the trial judge and subsequently affirmed by the Michigan Court of Appeals, held, in part, that:

[T]he police were aware of the nature of the scene, the fact that there might have been particles or something contained on

boots that he had worn. The Court rules that this was a reasonable search.[84]

Thus, contrary to Lovett's assertion on this point, his trial counsel did seek to suppress the shoes and acted with competence with regard to this issue.[85]

## IX.

### A

This Court has concluded that the record does not reflect any violation of Lovett's rights, as guaranteed by the Confrontation or Due Process clauses of the United States Constitution. With regard to Lovett's ineffective assistance of counsel claim, this Court has determined that his trial counsel's actions fell within the wide range of professional competence except on two occasions when he failed to (1) file a motion that would have sought the exclusion of his client's prior convictions and sentence, and (2) object to the prosecutor's questions regarding Lovett's silence when he was arrested.

### B

■ This Court must now evaluate the actions of Lovett's trial counsel under the second prong of the *Strickland* standard in an effort to determine whether the combined effect of these two failings by counsel is such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [86]

After an extremely careful review of the record, this Court does not believe that there is a reasonable probability that, but for counsel's unprofessional errors, the re-

---

81. Memorandum Opinion at 1137. *See People v. Lovett,* 85 Mich.App. 534, 272 N.W.2d 126 (1978), which rejected the arguments which Lovett now advances to this Court.

82. Objections at 18.

83. Tr. Vol. II, p. 63 (May 27, 1975).

84. *Id.* at 64 (emphasis added).

85. It is true that the Lovett's counsel had some difficulty in remembering this motion during

the evidentiary hearing before the Magistrate. However, it appears that Lovett's first counsel— not the attorney who appeared at the evidentiary hearing—filed the motion. The significant point on this issue is that the motion to suppress *was filed.*

86. 466 U.S. at 694, 104 S.Ct. at 2068. *See also Blackburn,* 828 F.2d at 1184.

sults of the criminal trial proceeding would have been different. There are several reasons for this conclusion.

First, the forensic evidence against him was very strong. Lovett was the last known person at the scene of the crime. He had blood on his shoes which matched the blood type of the victim. The Magistrate noted:

> Of the greatest significance was a blood spot found on petitioner's shoes which proved to be AB, the blood type of the victim, Linda Colby. This blood type is rare, occurring in only 3% of the population.[87]

Moreover, the sweater fibers, which were found on the victim's body, matched a sweater that had been worn by Lovett during the night of the murder. In addition, the polyester fibers on Lovett's shirt were similar in all respects to the polyester fibers which were found in the victim's brassiere. Arguably, Lovett also had a motive to commit the claimed offense because of his potential rage at being rejected by Deborah Guster.

In contrast to the strength of this evidence, this Court believes the impact of the errors by Lovett's counsel was minimal at best. The reference to Lovett's silence was isolated and not used to impeach him. Although it is true that this reference was reemphasized when the judge and the trial counsel advised the jury that it should not draw any inference from it, this Court does not believe that there is any probability— let alone a reasonable one—that this reference altered the result.

Moreover, this Court does not believe that the prior convictions had any major impact upon the jury or the verdict. These convictions were nonassaultive in nature, in that they involved the breaking and entering of a coin operated machine. These offenses were simply not serious enough to make much of a difference. In particular, the jury already had received a substantial amount of evidence regarding Lovett's prior personal problems. Moreover, there was strong evidence that a motion to sup-

press been denied. Thus, given the strength of the prosecutor's case, these errors did not make a difference or affect the ultimate outcome in this case. Neither the admission of illegal evidence into the record nor the errors of the defense attorney alter the view of this Court that the trial was not fundamentally unfair. Such errors were harmless under the totality of the circumstances.

## X.

Thus, for all the above reasons, Lovett's request must be denied and this case dismissed.

IT IS SO ORDERED.

---

87. Magistrate's Report at 5.