884 F.2d 579
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
William LOVETT, Petitioner-Appellant,
v.
Dale FOLTZ, Respondent-Appellee.
 No. 88-1682.
 United States Court of Appeals, Sixth Circuit.
 Sept. 5, 1989.
 
 Before NATHANIEL R. JONES and MILBURN, Circuit Judges and THOMAS A. HIGGINS, District Judge*.
 PER CURIAM.
 
 
 1
 Petitioner-appellant William Lovett appeals the judgment of the district court denying his petition for a writ of habeas corpus under 28 U.S.C. Sec. 2254. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 Lovett was convicted of felony-murder after a sixteen-day jury trial in Saginaw County Circuit Court in July 1975. He was convicted in connection with the rape and murder of a fifteen-year-old girl in January 1975. The Michigan Court of Appeals affirmed Lovett's conviction. See People v. Lovett, 85 Mich.App. 534, 272 N.W.2d 126 (1978). The Michigan Supreme Court held the case in abeyance, then denied leave to appeal in January 1982 and again in April 1982. Lovett eventually exhausted his state remedies.
 
 
 3
 On February 21, 1986, Lovett petitioned the district court for a writ of habeas corpus. Lovett raised the claims of ineffective assistance of counsel, denial of confrontation, prosecutorial misconduct and improper jury instructions.
 
 
 4
 In a Memorandum and Order dated July 31, 1987, the district court found that Lovett's claims of prosecutorial misconduct and improper jury instructions did not raise constitutional questions. The district court remanded the case to the magistrate for an evidentiary hearing on the claims of ineffective assistance of counsel and denial of confrontation. The magistrate conducted an evidentiary hearing on October 15, 1987.
 
 
 5
 On December 15, 1987, the magistrate filed a Report and Recommendation which recommended denial of Lovett's petition. Lovett filed objections to the report.
 
 
 6
 In a Memorandum Opinion and Order issued May 31, 1988, the district court conducted a de novo review of Lovett's claims and found them to be without merit. See Lovett v. Foltz, 687 F.Supp. 1126 (E.D.Mich.1988). The district court entered a judgment of dismissal with prejudice. Lovett filed a notice of appeal on June 23, 1988.
 
 B.
 
 7
 In the evening of January 22, 1975, Linda Colby, 15, went to the home of Debbie Guster to baby-sit Guster's two children, ages three and six. Colby was familiar with Guster and her children, as she had previously baby-sat for Guster. Shortly before 6:00 p.m., Margaret Mannion and James Sovey drove by Guster's home to take her to work. The three worked together at the Stardust Lanes bowling alley, and Guster's car was not working at the time. The three checked in at work at 6:03 p.m.
 
 
 8
 Sovey completed his shift before Mannion or Guster. With Guster's consent, he returned to her home, where he spent the next few hours. Sovey and his girl friend, Mannion, had also baby-sat for Guster, and he was known to her children as "Uncle Jim." Sovey returned to the bowling alley at midnight and waited for Mannion to complete her shift, which she did at approximately 1:00 a.m. Before she left, and at Guster's request, Mannion telephoned Colby to see if she could stay with the children for a longer period of time than previously arranged, as Guster now expected to have to work until 2:00 a.m.
 
 
 9
 When Mannion called, Lovett was at the front door of Guster's home. He entered and asked to speak to Guster, but she refused to talk to him, and became upset that he was in her home. Lovett left Guster's home a few minutes later and went to the bowling alley, but she refused to meet with him. After remaining at the bowling alley a short time, Lovett left between 1:15 and 1:30 a.m.
 
 
 10
 Lovett was married to his wife, Beverly. He had, however, maintained a sexual relationship with Guster for a considerable period of time. Sometime prior to January 22, Lovett struck Guster, either with a slap or closed fist, during or after the two had engaged in sexual intercourse. Lovett testified Guster had invited the slap in a masochistic manner. But she testified that he had punched her in anger, and as a result, she had attempted to break off their relationship.
 
 
 11
 During the evening of January 22, Lovett played basketball with several friends. Lovett then drank beer with his friends until shortly before 1:00 a.m., when he drove to Guster's home. When he could not speak to her over the telephone or at the bowling alley, he testified that he drove home. His wife testified that Lovett had promised to be home by 11:00 p.m., but did not arrive until shortly after 2:00 a.m.
 
 
 12
 Guster arrived home at approximately 2:45 a.m. Upon entering, she discovered Colby's body. She called the police and, when they arrived, informed them that Lovett had been in her home with the baby-sitter. The police went to Lovett's home, arriving there at approximately 4:30 a.m. The officers took Lovett into custody, informed him of his Miranda rights, and told him he would be questioned about a homicide.
 
 
 13
 Lovett's wife had answered the officers' knock on the door. When Lovett came from his bedroom to meet them, he was wearing a bathrobe. The officers told him to dress for the trip to the police station, and then accompanied Lovett to his bedroom. The officers saw various articles of clothing strewn about Lovett's bedroom, and when he acknowledged that he had worn those clothes during the evening, they were seized as possible evidence. Lovett was eventually taken to the police station, where he gave a statement denying guilt in Colby's death.
 
 
 14
 Lovett's trial lasted sixteen days. One of the most significant exhibits in the state's case was a blood spot found on one of the shoes Lovett had worn the night of January 22 and morning of January 23, 1975. The blood spot proved to be type AB, the blood type of the victim, Colby. Type AB blood is rare, occurring in only approximately three percent of the population. Moreover, yellow wool sweater fibers imbedded in the blood stain on Lovett's shoe matched fibers from the yellow wool sweater Colby was wearing at the time of her death.
 
 
 15
 Other evidence indicated that polyester fibers found on Lovett's shirt were similar in all respects to polyester fibers from Colby's brassiere. Forensic testimony matched strands of hair found on Colby's clothes and body with Lovett's pubic and head hair. Semen taken from Colby's vagina proved to be from a male with type O blood, and an analysis of Lovett's semen indicated that he had type O blood.[1]
 
 II.
 
 16
 The state court's findings of fact in this case are presumed to be correct. See 28 U.S.C. Sec. 2254(d). Moreover, the district court's findings of fact in a habeas case are subject to the clearly erroneous standard of review. See Blackburn v. Foltz, 828 F.2d 1177, 1181 (6th Cir.1987), cert. denied, 108 S.Ct. 1247 (1988). "Deference to lower court's findings is especially warranted in cases where the critical evidence is testimonial." McCall v. Dutton, 863 F.2d 454, 459 (6th Cir.1988), cert. denied, 109 S.Ct. 1744 (1989). As there are claims of ineffective assistance of counsel in this case, we note that "the performance and prejudice components of the Strickland test are mixed questions of law and fact freely reviewable by the appellate court." Blackburn, 828 F.2d at 1181 (citing Strickland v. Washington, 466 U.S. 668, 698 (1984)).
 
 
 17
 Lovett's defense counsel elected to use a strategy of "baring the soul," despite his belief that the defense necessarily involved the admission of what might otherwise be inadmissible evidence. As part of this defense, Lovett's defense counsel tried to minimize the number of objections he would raise at trial in an attempt to avoid highlighting the evidence he might otherwise find objectionable. Therefore, several of the issues Lovett raises in this action were not preserved by contemporaneous objections at trial.
 
 A. Ineffective Assistance of Counsel
 
 18
 In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court set out a two-pronged test for determining whether an attorney's representation of an accused at trial was "effective" within the meaning of the Sixth Amendment:
 
 
 19
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 
 
 20
 Id. at 687.
 
 
 21
 Strickland makes clear that the defendant has a heavy burden of showing that his trial counsel's performance fell outside of "the wide range of reasonable professional assistance," id. at 689, and that but for counsel's deficient performance, the result of the proceedings would probably have been different. Id. at 687, 695. Reviewing courts are not to indulge themselves in hindsight, "but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors." Blackburn, 828 F.2d at 1180.
 
 
 22
 Lovett claims his trial counsel was ineffective in failing to make a motion in limine to suppress evidence of Lovett's prior convictions and past personal troubles. Lovett also asserts ineffective assistance in his trial counsel's failure to object to certain questions asked by the prosecutor on direct and cross-examination, to evidence that Lovett had remained silent after being arrested, to testimony supposedly contrasting Lovett's silence to other witnesses' cooperation, to the hearsay testimony of Earnest Amaro, failing to object to the jury instructions on the alibi defense, and failing to object to Lovett's warrantless arrest.[2]
 
 
 23
 At trial, either through the direct or cross-examination of Lovett or other witnesses, the jury learned that Lovett had been convicted twice before for attempted break-ins and once for an attempted breaking and entering of a vending machine; that he had served time in a state penitentiary for his convictions; that he had a past history of employment problems, including being fired once for falsifying his past employment record; that he had been divorced four times and had two other marriages annulled, and that he had maintained a sexual relationship with Guster while he was married to his wife, Beverly. Lovett asserts all of this information was prejudicial, none went to his credibility, and all could have been kept out had his trial counsel filed a motion in limine to suppress.
 
 
 24
 The magistrate found the trial counsel's failure to file a motion to suppress and his elicitation of prior convictions and other information from Lovett was reasonably related to his trial strategy of "baring the soul." The district court determined that trial counsel's conduct did not meet minimal standards of professional competence, but that Lovett did not suffer prejudice under the Strickland standard. We agree that the trial counsel's failure to file a motion in limine to suppress fell "outside the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.
 
 
 25
 Petitioner's trial counsel explained at the evidentiary hearing that he believed Lovett's best trial strategy would be to confront his past before the jury to demonstrate his honesty and candor, while emphasizing the lack of violence in his personal history. We agree with the district court that petitioner's trial counsel's preparation did not reach the professional incompetence demonstrated in Kimmelman v. Morrison, 477 U.S. 365 (1986), but the label "strategy" is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel.
 
 
 26
 In this case, petitioner's trial counsel admitted that his failure to object to introduction of Lovett's prior sentences was based on his ignorance of the law.[3] Regarding the other damaging material to which Lovett now objects--his prior convictions, divorces, annulments, the fact that he had met one former wife while he was in prison and she was married to another inmate--we believe that while "baring the soul" may have been a reasonable defense theory, its use in this case does not excuse counsel's failure to object to what might otherwise have been inadmissible evidence. "Strategy," whether labeled "baring the soul" or with some other name, is not the equivalent of "opening the floodgates." Our review of the totality of the facts of this case, Kimmelman, 477 U.S. at 384-85, leads us to the conclusion that trial counsel's performance fell below reasonable levels of professional competence.
 
 
 27
 We also agree with the district court that a review of the entire record in this case does not establish a reasonable probability that, but for counsel's errors, the results would have been different. The physical evidence was strong, placing Lovett at the scene of the crime, as the last person to be with the victim when she was alive, and arguably, as a person motivated by Guster's rejections. We do not believe evidence of Lovett's prior marital problems and his convictions for nonviolent crimes influenced the jury in a manner that undermines our confidence in the verdict. Additionally, as the district court pointed out, based on Michigan law, it appears likely that a motion in limine to suppress would have been largely denied. See People v. Jones, 98 Mich.App. 421, 296 N.W.2d 268, 273 (1980). Thus, we conclude that the claim of ineffective assistance of counsel pertaining to the failure to file a motion in limine to suppress fails under the prejudice prong of Strickland.
 
 
 28
 Lovett next asserts that the trial counsel's failure to object to testimony of his marital problems, unemployment at time of trial, that he hit Guster in anger, and one time slapped his wife, Beverly, before they were married shows ineffective assistance of counsel. The magistrate and district court both rejected Lovett's allegation of representational incompetence, and we agree.
 
 
 29
 First, as Lovett has continually failed to consider, this is not a direct appeal of a recent federal conviction, nor are there any specific prior bad act rulings of the trial court to be reviewed. The issue here is the reasonableness of trial counsel's decision to introduce or allow the introduction of evidence of the bad acts based upon his belief that admission was inevitable and would also serve the strategy of baring Lovett's soul.
 
 
 30
 The magistrate found Guster's testimony that Lovett had hit her was admissible "to show the relationship between the petitioner and Debbie Guster." Guster's direct testimony here was relevant to the prosecution's theory that Lovett was acting on lust and rage during the night in question, and the trial counsel's failure to object to it is not evidence of incompetence. Similarly, it was not incompetent for defense counsel to call Lovett's wife, Beverly, as an alibi witness to support another defense theory. By doing so, however, he exposed her to impeachment. Moreover, it appears that Beverly Lovett was an uncontrollable witness, and much of the information she provided the jury on her husband's past spouted forth despite trial counsel's efforts to restrain her testimony. Lovett, 687 F.Supp. at 1143.
 
 
 31
 Lovett asserts that his trial counsel was ineffective in failing to object to the hearsay testimony of Earnest Amaro, a bowling alley employee who worked with Guster. Amaro became involved in petitioner's trial through the testimony of Officer Wayne Badour, who testified that Amaro told him that he could identify the individual he saw in the bowling alley parking lot at approximately 1:30 a.m. who asked to speak to Guster. Officer Badour testified that he arranged a lineup, but Amaro was not able to identify Lovett in the lineup. But Badour testified that Amaro later told him that if Lovett had worn facial hair at the lineup, as he did in the early morning of January 23, he could have identified him as the person he had seen in the parking lot. Neither the government nor Lovett called Amaro to the stand, though the prosecution did produce him in case the defense wished to call him. During closing argument, the defense counsel asked the jury to consider why the government had not called Amaro as a witness.
 
 
 32
 At the evidentiary hearing conducted by the magistrate, Lovett's trial counsel testified that he did not call Amaro because he feared Amaro would make an in-court identification of Lovett. Instead, counsel attempted to discredit Amaro through Officer Badour by pointing out that (1) Amaro had failed to identify anyone in the lineup and (2) the lighting in the bowling alley parking lot was very dim.
 
 
 33
 The district court found trial counsel's choice to impeach Amaro through Badour instead of calling him to the stand and risking an in-court identification was a deliberate, strategic, and reasonable decision. Lovett, 687 F.Supp. at 1132. We agree.
 
 
 34
 Lovett also claims that his trial counsel was ineffective in failing to object to (i) evidence that Lovett had remained silent after his arrest; (ii) to the prosecutor's contrasting Lovett's exercise of his rights with James Sovey's cooperation; and (iii) to the court's alibi instructions. We will discuss these claims below.
 
 B. Prosecutorial Misconduct
 
 35
 In Darden v. Wainwright, 477 U.S. 168 (1986), the Supreme Court set out the standard for reviewing claims of prosecutorial misconduct in a collateral attack. For a petitioner to prevail, he must show the prosecutorial misconduct was so egregious and pervasive that it infected the entire trial with unfairness, depriving the accused of due process. Id. at 181. See also United States v. Ashworth, 836 F.2d 260, 267 (6th Cir.1987). In evaluating charges of prosecutorial misconduct, the court should look at whether the defense invited the error, the pervasiveness of the misconduct, its egregiousness and deliberateness, and its weight when compared to the total body of evidence produced at trial. Darden, 477 U.S. at 181-83.
 
 
 36
 Lovett contends that the prosecutor deprived him of due process in a series of questions relating to his post-Miranda silence. He also contends that his trial counsel's failure to object to these questions amounted to ineffective assistance of counsel. Lovett cites the following exchange between the prosecutor and the Sheriff's Department's Sergeant Balton, who went to Lovett's house from the crime scene:
 
 
 37
 Q: And what does--what did you tell Mr. Lovett on January 23 with respect to waiver?
 
 
 38
 A: He was asked if he understood each of the rights that had been explained to him; and having the rights in mind, did he wish to speak to us now.
 
 
 39
 Q: Mr. Lovett was asked this?
 
 
 40
 A: Yes.
 
 
 41
 Q: And in your presence, did he indicate a response?
 
 
 42
 A: Not that I can recall.
 
 
 43
 Q: All right. Did he indicate that he heard the rights?
 
 
 44
 A: Yes.
 
 
 45
 Q: Okay. Did he say that he understood them and wishes to make a statement or did he just--
 
 
 46
 A: He didn't say that he wanted to make a statement or anything.
 
 
 47
 The prosecutor did not examine Lovett regarding his post-Miranda silence, nor did he make any reference to it during closing arguments. Moreover, the trial judge instructed the jury that an accused has a right to remain silent, and the trial counsel mentioned this right in his closing argument.
 
 
 48
 Lovett contends this mention of his post-Miranda silence is in violation of the decision in Doyle v. Ohio, 426 U.S. 610 (1976), which held that a defendant's post-arrest silence may not be used to impeach him. What Lovett fails to mention, however, is that Doyle was effectively limited to impeachment purposes in the subsequent decisions of Wainwright v. Greenfield, 474 U.S. 284 (1986), and Greer v. Miller, 483 U.S. 756 (1987).
 
 
 49
 Analyzing this case in light of Greer, the district court found no Doyle violation, and we agree. The contested exchange was an isolated reference that occurred during a sixteen-day trial. The prosecutor did not use Lovett's post-Miranda silence to impeach his alibi, nor did he mention it in his closing argument. Moreover, as in Greer, the judge gave a limiting instruction to the jury about a defendant's right to remain silent. Consequently, we also agree with the district court that the trial counsel's failure to object to the prosecutor's questioning was well within the range of professionally competent assistance.
 
 
 50
 Lovett next asserts that the prosecutor acted impermissibly in his references in the trial to what Lovett refers to as "immoral and illegal acts"--his extramarital relationship, his previous unsuccessful marriages, his striking of Guster and his own wife, and other bad acts discussed above. Lovett also asserts that prosecutorial misconduct occurred when the prosecutor elicited hearsay testimony that neighbors reported that Lovett's home was often the scene of "family trouble," and in eliciting testimony that emphasized that James Sovey had voluntarily supplied police with samples of his hair, blood and other items.
 
 
 51
 With regard to Sovey, the district court found the prosecutor's questioning was permissible to rebut the defense's theory that Sovey was a possible suspect and had something to hide, and to bolster the credibility of its witness after he had been attacked. We agree that the prosecutor's questioning was reasonable and permissible, and certainly not so egregious as to deprive Lovett of due process, and that the trial counsel's failure to object to the prosecutor's questioning is not evidence of incompetence.
 
 
 52
 Regarding Lovett's other claims, including the references to "family trouble" in Lovett's home, these matters were all either previously raised or subsequently explored by the defense. The prosecutor's questioning remained within the bounds of proper direct and cross-examination, and the matters explored related to issues raised by the defense, Lovett's credibility, the credibility of other witnesses, and their relationships with him. We agree with the district court that the prosecutor did not act impermissibly in pursuing these matters. See United States v. Beros, 833 F.2d 455, 463-64 (3d Cir.1987).
 
 C. Confrontation
 
 53
 Lovett argues that Badour's testimony of Amaro's alleged statement regarding the lineup and Lovett's facial hair was hearsay--an out-of-court statement offered to prove the matter asserted within. Lovett also asserts Badour's testimony was "to a nonstatement by Mr. Amaro." Regardless, Lovett complains that Badour's testimony left him in the difficult position of doing nothing or continuing exploration of the issue at the risk of having Amaro testify and make an in-court identification.
 
 
 54
 The district court found this predicament was of Lovett's own making, as he did not object to Badour's testimony and indeed helped him explain it. Moreover, this waiver was part of a deliberate trial strategy and the reasonable decision to avoid the in-court identification. We agree that with respect to Amaro's out-of-court statements, Lovett validly waived his rights to confront the witness against him.
 
 
 55
 Lovett also complains the trial court infringed upon his right "to free and open cross-examination" of Guster. Lovett's defense counsel attempted to question Guster about her divorce and custody battle, which were occurring during the summer of trial. Lovett insists that the prosecutor arranged to have the custody hearing adjourned during the trial, and in so doing, he held undue influence over Guster. The trial court allowed Lovett's trial counsel to cross-examine Guster regarding her relationship with Lovett, but not her alleged bias stemming from her relationship with the prosecutor.
 
 
 56
 After questioning Lovett's trial counsel at the evidentiary hearing, the magistrate concluded that there was no evidence to support Lovett's allegations that Guster had received prosecutorial favors in her custody case. Therefore, he concluded the trial court's curtailment of the cross-examination of Guster did not constitute a confrontation clause violation. The district court agreed, pointing out that the trial counsel's pursuit of a potential conflict of interests through cross-examination demonstrated effective representation. Lovett, 687 F.Supp. at 1136.
 
 
 57
 A basic problem with Lovett's arguments is that the right of confrontation does not guarantee "free and open cross-examination." Rather, it guarantees an opportunity for effective cross-examination. Delaware v. Fensterer, 475 U.S. 15, 19-21 (1985) (per curiam). Moreover, the right to confront witnesses does not preclude reasonable limits on defense inquiries into the potential bias of prosecution witnesses. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Especially in light of the magistrate's findings, which are not clearly erroneous, we agree that the limitations the trial court placed on the cross-examination of Guster were well within permissible bounds.
 
 D. Alibi Instructions
 
 58
 Lovett's final argument is that the trial court's instructions on the alibi defense wrongfully shifted the burden of proof to the accused. Moreover, he insists that his trial counsel's failure to object to the instructions constituted ineffective legal assistance. The contested instruction read as follows:
 
 
 59
 The defendant has filed in this case a defense of what is known in the law as alibi. That is that the defendant was at another place at the time of the commission of the crime, and I'll instruct you that such a defense is as proper and as legal, if proven, as any other, and all the evidence bearing on that point should be carefully considered by the jury, and if in view of the evidence, the jury have a reasonable doubt as to whether the defendant was at some other place at the time the crime was committed, they should give the defendant the benefit of the doubt and find him not guilty.
 
 
 60
 The defendant is not required to prove that defense beyond a reasonable doubt to entitle him to an acquittal. It is such evidence upon that point that raises a reasonable doubt of his presence at the time and place of the commission of the crime charged.
 
 
 61
 People v. Lovett, 272 N.W.2d at 128 (finding the instruction did not constitute reversible error upon direct appeal) (emphasis in original).
 
 
 62
 Lovett asserts the phrase emphasized above--"if proven"--rendered the instructions constitutionally infirm. The district court concluded otherwise, finding the instructions did not shift the burden of proof or otherwise deprive Lovett of due process.
 
 
 63
 The district court found that the phrase "if proven" could be interpreted by the jury as meaning "if proven by all the evidence," not "if proven by the defendant." We agree. Moreover, the instructions emphasized that the jury should give the benefit of the doubt to the defendant and that an alibi defense is as valid as any other. We also agree with the magistrate that the defense counsel's failure to object to the instruction did not amount to ineffective assistance of counsel. Additionally, even if trial counsel was ineffective in failing to object, there is no evidence that Lovett was prejudiced to the point of satisfying the second Strickland prong. That is, there is no evidence that the results of the trial would have been different had the phrase "if proven" not been uttered to the jury.
 
 III.
 
 64
 For the foregoing reasons, the judgment of the district court denying Lovett's petition for habeas corpus is AFFIRMED.
 
 
 
 *
 Honorable Thomas A. Higgins, United States District Judge, Middle District of Tennessee, sitting by designation
 
 
 [1]
 The Michigan Court of Appeals subsequently determined that the pubic hairs and semen sample taken from Lovett were obtained with an unsworn search warrant and did not constitute competent evidence, though admission at trial proved harmless in light of the rest of the state's evidence. People v. Lovett, 272 N.W.2d at 127-28
 
 
 [2]
 This argument is wholly without merit, as Lovett's trial counsel objected to the warrantless arrest in a pretrial motion. Lovett, 687 F.Supp. at 1144
 
 
 [3]
 See People v. White, 26 Mich.App. 35, 181 N.W.2d 803, 806 (1970) (holding prior sentences are not admissible)