NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0545n.06
Filed: September 5, 2008

No. 07-3527

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **TIERRE R. MANLEY**, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| *Petitioner-Appellee,* | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| v. | ) | |
| | ) | **O P I N I O N** |
| **ROSS CORRECTIONAL INSTITUTION**, Warden, | | |
| | | |
| *Respondent-Appellant.* | | |

BEFORE:    COLE and CLAY, Circuit Judges; and RUSSELL, District Judge.[*]

**COLE, Circuit Judge**. Respondent-Appellant, Warden of the Ross Correctional Institution,

appeals a judgment conditionally granting a writ of habeas corpus to Petitioner-Appellee Tierre

Manley. Following a jury trial, an Ohio state court convicted Manley of murder with a firearms

specification. An Ohio appellate court affirmed Manley's conviction and sentence, following which

the Ohio Supreme Court denied review. Upon filing a petition for habeas relief, the district court

concluded that Manley received ineffective assistance of counsel under the Sixth Amendment,

finding that defense counsel acted deficiently and prejudiced Manley's theory of self-defense by (1)

calling a police detective as a witness for the defense and (2) eliciting and failing to object to certain

details about Manley's juvenile convictions. Accordingly, pursuant to the dictates of the

---

[*] The Honorable Thomas B. Russell, United States District Judge for the Western District
of Kentucky, sitting by designation.

Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), the district court concluded that the state appellate court unreasonably applied clearly established federal law in rejecting Manley's claim of ineffective assistance of counsel and issued Manley a conditional writ of habeas corpus. For the reasons set forth below, we **REVERSE** the decision of the district court.

## I. BACKGROUND

The state appellate court summarized the offense giving rise to Manley's conviction as follows, and, on appeal, both parties accept this version of the facts as undisputed:

> In the early morning hours of June 2, 2001, [Manley] shot Stephen Glover several times. On June 3, 2001, Mr. Glover died as a result of the injuries he sustained from that incident. The shooting was apparently the result of a conflict that arose between Mr. Glover and [Manley] on the night of June 1, 2001 while the two were playing pool at a local bar, Club Utopia. According to [Manley], he and Mr. Glover made a thirty dollar bet on a round of pool but, when he lost, Mr. Glover paid [Manley] only twenty dollars. At that point, an altercation ensued between the parties, which began inside the bar and continued outside. According to defense witnesses, after the initial scuffle inside the establishment, the victim and several of his friends waited outside and attacked [Manley] as he left the bar.

> The parties then proceeded to a birthday party at the Fraternal Order of Police Hall, where yet another fight broke out between them. Although there is conflicting testimony as to who started the altercation, several witnesses, including the defendant, alleged that the victim caught the defendant off guard, hitting him in the face with a beer bottle. Eventually, due to another fight at the same location, the police arrived on the scene and sent the party-goers home. According to [Manley], his cousin drove him to his mother's house so that he could nurse the injuries he received during the fights.

> [Manley] claims that he decided to go from his mother's house to his girlfriend's house, and that his cousin set out to drive him there. On the way, the two passed by the intersection of Elm Street and Nye Street, near which Mr. Glover and his friends were congregated. By the defendant's version of the events, [Manley] and his cousin stopped their vehicle because someone called out [Manley's] name. Thereafter, both [Manley] and his cousin exited the vehicle and the appellant talked

- 2 -

to Mr. Glover. At this point, another fight commenced. At trial, Mr. Manley claimed that Mr. Glover pulled a gun during the fight and that, simultaneously, a third person, George Elliot, began shooting. [Manley] claims that he wrestled the gun from Mr. Glover and began to fire, then tossed the gun into the street and fled in his vehicle.

Witnesses for the state, on the other hand, testified that the appellant and his cousin pulled up to the corner of Elm and Nye and remained in their vehicle. Mr. Glover then proceeded to the passenger side of the vehicle and spoke to [Manley], apparently in an effort to end the dispute. While still seated in the vehicle, [Manley] produced a gun and shot Mr. Glover in the head and then fired three or four additional shots at the victim as he lay in the street. The victim was taken to St. Rita's Medical Center, where he died the next day.

*State v. Manley*, No. 1-01-159, 2002 WL 31323328, at *1 (Ohio Ct. App., Oct. 18, 2002).

In response to the preceding events, the state of Ohio indicted Manley on one count of aggravated murder and one count of murder. The state subsequently dismissed the murder charge. A trial was then held in the Allen County Court of Common Pleas on November 1, 2001. During the course of testimony at trial, it was established that the altercation arose out of an allegedly unsatisfied pool hall debt. Manley and Glover placed a thirty dollar bet on the outcome of a billiards game, which Manley ultimately won. When Manley sought to collect his payment from Glover, he claimed that Glover only paid him twenty dollars. When Manley questioned Glover about the additional ten dollars, he insisted that Glover refused to pay. Thereafter, both Manley and his friends and Glover and his friends proceeded to a party at the Fraternal Order of Police Hall. Manley testified that as soon as he entered the building, Glover hit him on his eye with a beer bottle, causing his eye to swell. Due to the onset of a second fight, the police arrived and shut the party down. The two groups then proceeded to the intersection of Nye and Elm streets, a common after-hours gathering spot, where the shooting took place later that evening.

During the state's case-in-chief, the prosecution called three eyewitnesses, namely Jamie Wilson, Titus Brown, and Ronald Dillingham, to testify about their version of the facts. All three witnesses testified that Manley remained in his truck throughout the altercation, was armed from the onset of the confrontation, and delivered the fatal gunshots to Glover from the inside of his truck. Moreover, Dillingham testified that he observed Glover raise his hand in defense as Manley aimed his gun at Glover and shot him from his truck.

In response, Manley's strategy at trial hinged on depicting the shooting of Glover as either an act of self-defense or as a response to provocation by Glover. Under both of these theories, Manley's credibility was central, as both theories depended on "Manley's claims that he got out of his truck to speak to Glover in the street, that only the decedent was armed at the time of this confrontation, that others were shooting at Manley during this episode, and that during this struggle Manley acquired the gun from which he fired the fatal shot." (Joint Appendix ("JA") 1256-57.)

To support Manley's version of the events, Manley's trial counsel called Lima Police Detective Paul Guidera as a defense witness and solicited testimony on direct examination about interviews he conducted with three purported witnesses to the shooting, namely Jamie Wilson, Titus Brown, and Tierre Scales.[1] Of these three individuals, Wilson and Brown testified at trial for the prosecution; neither the prosecution nor defense called Scales as a witness. Guidera further testified that Wilson, Brown, and Scales told him that Manley was the only person at the scene in possession of a gun, that Manley never exited his truck, that the bullet which killed Glover emerged from inside

---

[1]Indeed, the prosecutor noted the atypical nature of defense counsel's decision to call Guidera as a witness when he stated, "Detective, I have the rare opportunity to cross examine a police officer." (JA 894.)

- 4 -

Manley's truck, and that subsequent shots were fired from inside the truck as Manley fled the scene in it.

In addition to calling Detective Guidera, Manley's trial counsel called Manley as a witness and questioned him about his juvenile criminal record. Specifically, Manley's counsel elicited testimony that, at the age of sixteen, Manley committed two aggravated assaults, for which he was incarcerated until just before his twenty-fifth birthday. Manley's attorney also questioned two other defense witnesses, Joe Pea, a boyfriend of Manley's mother, and Andre Manley, Manley's second cousin, about Manley's convictions as a juvenile.

The jury found Manley not guilty of aggravated murder but guilty of the lesser-included offense of murder. At sentencing, Manley received a term of fifteen years to life on the murder conviction, plus an additional three years on a firearms specification.

Employing new counsel, Manley directly appealed his conviction and sentence to the state court of appeals. The court of appeals affirmed both convictions and the sentence. Thereafter, Manley sought review by the Ohio Supreme Court, which dismissed the appeal because it presented no substantial questions of constitutional law.

Manley next filed a petition for a writ of habeas corpus in federal district court setting forth three grounds for relief: (1) the trial court's failure to instruct the jury on voluntary manslaughter amounted to a denial of his right to due process and a fair trial; (2) he was denied his rights under the Sixth and Fourteenth Amendments due to the ineffective assistance rendered by his trial counsel; and (3) he was denied his right to due process and a fair trial when the state proffered evidence of his juvenile convictions.

The parties consented to the jurisdiction of Magistrate Judge William H. Baughman, Jr., who, without a hearing, issued a memorandum opinion and order granting Manley a conditional writ of habeas corpus on his Sixth Amendment claim of ineffective assistance of counsel. Marshaling the two-pronged test for ineffective assistance of counsel as articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), and this Court in *Higgins v. Renico*, 470 F.3d 624 (6th Cir. 2006), the court focused its analysis on whether, under AEDPA, the state court of appeals unreasonably applied the *Strickland* test to the facts of Manley's case.

First, the court addressed the deficiency prong of the *Strickland* test. While noting that "federal law is plain that defense counsel is entitled to a strong presumption of having rendered reasonable professional service," the court concluded that Manley's trial counsel did not merit such a presumption. (JA 1263.) Specifically, in the court's estimation, "Manley's counsel should have known through his own investigation of Detective Guidera's role in the case and a basic familiarity with the witness list that the detective had personally interviewed three purported witnesses who would not themselves testify at Manley's trial and whose story would, if heard by the jury, directly contradict his client's." (JA 1264.) The court characterized as "inexcusable" Manley's attorney's decision to place Guidera on the stand and "then, through him, intentionally bring[] before the jury the stories of three uncalled, unsworn, uncross-examined witnesses in direct contradiction to his own client's testimony." (*Id*.)

Similarly, the court took issue with defense counsel's decision to bring to light Manley's juvenile convictions. Although agreeing with the state appeals court that it is a common defense tactic to inform the jury of any prior record before the prosecution does so, the court found

- 6 -

unreasonable the extent to which Manley's counsel elicited details about his prior convictions.

Upon finding multiple examples of deficient performance, the court concluded that defense counsel's performance was prejudicial because his "errors directly undercut Manley's credibility." (JA 1266.) Despite the number of eyewitnesses available to the prosecution, the court emphasized their suspect credibility, as they were all friends of Glover and members of a gang called the Westside Boys known for selling drugs. In the court's view, "[w]eighing [these witnesses'] testimony that Manley was the sole, unprovoked shooter against Manley's defense, a reviewing court cannot be confident that a jury would believe these witnesses in the absence of the damage to Manley's credibility." (*Id*.)

Based on the foregoing, the court concluded that there was a "'reasonable probability' that, but for defense counsel's errors, the verdict reached here would have been different." (*Id*.) Accordingly, the court granted Manley a conditional writ of habeas corpus relief on his claim of ineffective assistance of counsel. The Warden timely appealed.

## II. ANALYSIS

### A. Standard of Review

We employ a *de novo* standard to review the district court's legal conclusions in habeas proceedings. *Dennis v. Mitchell*, 354 F.3d 511, 516-17 (6th Cir. 2003). We generally review the district court's factual findings under a clear-error standard. *Id*. at 517.

Because Manley filed his habeas corpus petition on June 8, 2004, after AEDPA became effective on April 24, 1996, AEDPA governs our review of the decisions of the Ohio trial and

appellate courts. *See Lindh v. Murphy*, 521 U.S. 320, 323 (1997) (holding AEDPA applicable to petition filed after AEDPA's effective date).

In AEDPA, Congress provided that:

(d) an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (d)(1)-(2)

On appeal, Manley claims entitlement to relief under § 2254 (d)(1)'s "unreasonable application" clause. Within the context of this clause, the Supreme Court has interpreted "clearly established Federal law" to encompass only its "holdings, as opposed to the dicta" in its opinions. *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) (quoting *Williams*, 529 U.S. 362, 412 (2000)). Under the "unreasonable application" clause, habeas relief is available if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Dennis*, 354 F.3d at 517 (citing *Williams*, 529 U.S. at 413).

Relief is further warranted under § 2254 (d)(1) when a "state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Keith*, 455 F.3d at 669. In both situations, the central inquiry is "whether the state court decision was objectively unreasonable and not simply erroneous or

incorrect." *Id.* That is, in applying the "unreasonable application" clause, we must be careful not to substitute our own judgment for that of the state court by equating the more stringent standard of "objectively unreasonable" with the more lax standard of "clear error." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

**B.      Ineffective Assistance of Counsel**

Drawing on the standard articulated in AEDPA, our task is to determine whether the Ohio appellate court's denial of Manley's claim of ineffective assistance of counsel was contrary to, or an unreasonable application of, clearly established federal law. Our analysis leads us to answer this question in the negative.

In raising his ineffective assistance claim, Manley cites two allegedly unreasonable and prejudicial maneuvers made by his defense counsel. First, Manley argues that his trial attorney acted deficiently in calling Detective Guidera as a witness and introducing hearsay statements about Guidera's conversations with several eyewitnesses to the shooting. Second, Manley challenges his counsel's decision to delve into significant details about his juvenile convictions and his failure to object to the prosecution's inquiry into his prior record. In determining whether the state court unreasonably applied clearly established federal law, *Strickland v. Washington*, 466 U.S. 668 (1984), is the relevant starting point for our AEDPA analysis.

In *Strickland*, the Supreme Court fashioned a two-prong test that a defendant must satisfy to establish a Sixth Amendment violation: (1)"the defendant must show that counsel's performance was deficient," and (2) "the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687. To establish deficient performance under the first prong, Manley "must show that [his]

counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.  In determining what is reasonable, our scrutiny of counsel's performance must be highly deferential: that is, we "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (internal citations omitted).

To demonstrate prejudice under the second prong, Manley "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.  In determining whether there was prejudice, we "must consider the totality of the evidence before the judge or jury." *Id*. at 695.

### 1.  Deficient Performance[2]

#### a.  Introduction of Manley's Prior Crimes

As his first charge of deficient performance, Manley points to his attorney's extensive inquiry into his prior criminal record and his failure to object to the prosecution's similar line of questioning. We are of the view that defense counsel's decision to probe into Manley's criminal history does not qualify as unreasonable professional conduct.  The subject of Manley's criminal history arose three times during the course of the trial.  One of the initial questions Manley's defense counsel asked Manley was about his criminal history:

---

[2]Given our ultimate finding that trial counsel's performance did not prejudice Manley's defense, we note that we could proceed without discussing deficient performance. *See Strickland*, 466 U.S. at 697 (explaining that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").  Nevertheless, we choose to examine both components of the two-pronged test.

- 10 -

Q: At what age did you run into bad trouble?
A: Right before I turned sixteen . . . .
Q: Earlier than age sixteen were you in trouble in juvenile court?
A: I think I had one incident, yes.
Q: Okay. What were the felony charges that you had at age sixteen?
A: Two aggravated assaults.
Q: All right. And there was some testimony this morning – what were they about?
A: Basically I was running with the wrong crowd at that time and got caught up.
Q: Okay. Somebody get shot then?
A: Yes, two individuals.
Q: And what were their names?
A: Kelly Shurelds and Napoleon Shurelds.
Q: All right. So am I correct, you then spent from age sixteen until when in our penal system here in the state of Ohio, til what age?
A: I got out four days before I turned twenty-five.

(JA 1057-58.)

On cross-examination, the prosecution inquired further into the details of Manley's criminal record. Specifically, the prosecutor asked Manley whether, similar to the injury in the instant case, Manley shot one of the victims in the back. The prosecutor also asked Manley if the weapon involved in his prior crimes was a .45 caliber pistol, the same type of weapon involved in the instant shooting.

Later in the trial, defense counsel questioned Joe Pea about his knowledge of Manley's prior convictions. Pea stated that Manley was involved in a shooting incident when he was sixteen, for which was incarcerated for seven to eight years. On cross-examination, Pea answered affirmatively when the prosecutor asked whether Manley's juvenile record involved him shooting two people. Pea further confirmed that, at the time of trial, Manley had only been out of prison for a little over a year.

The subject of Manley's criminal history arose a third time when Andre Manley testified as a witness for the defense. On cross-examination, Andre responded affirmatively when the prosecutor

asked him whether Manley's prior conviction involved him shooting a man in the back twice and shooting another person. Defense counsel objected to both questions, but these were the only objections on record to the prosecutor's inquiry into the details of Manley's criminal history.

In its opinion, the district court noted that having the defendant bring to light past convictions was a common trial tactic but took issue with the level of detail to which the jury became privy as a result of this testimony. According to the court, defense counsel acted deficiently by both adducing and failing to object to the prosecutor adducing information about the type of weapon used in the prior shooting, the same caliber handgun used in Glover's killing.

We disagree. Notwithstanding the unfavorable nature of the information elicited about his prior crimes and the similarities with respect to the instant crime—both shootings and both involving the same type of weapon—the rules of evidence permitted the prosecutor to inquire into such details. The evidence of Manley's criminal history was admissible pursuant to Ohio Rule of Evidence 404(B). This rule provides in pertinent part:

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Ohio R. Evid. 404(B). As the trial judge explained in overruling defense counsel's objection to the testimony about the similarity of the weapon Manley used in his prior convictions and the weapon used in the instant shooting, this evidence is arguably admissible to show absence of mistake. Admittedly, the fact that the prior incidents occurred nine years ago, when Manley was only sixteen,

- 12 -

weakens their probative value with respect to absence of mistake. Nevertheless, it does not rise to the level of constitutional deficiency for the defense counsel to have introduced this evidence.

**b.    Decision to Call Detective Guidera as a Defense Witness**

While Manley's first charge of ineffective assistance is unavailing, his second charge stands apart. We are of the view that defense counsel's decision to call Guidera as a witness constituted deficient performance under *Strickland* because it bolstered the testimony provided by witnesses for the prosecution and relayed to the jury additional testimony corroborating the prosecution's version of the facts. Upon calling Guidera as a witness, Manley's attorney proceeded to question Guidera about his interviews with several eyewitnesses to the shooting. Three of the individuals referred to by Guidera—Jamie Wilson, Titus Brown, and Ron Dillingham—all appeared at trial as witnesses for the prosecution. Defense counsel, however, also questioned Guidera about his interviews with several other eyewitnesses who did not testify, including Tierre Scales, Gary Jackson, and Aaron Porter. Likewise, defense counsel also inquired about "any other individuals who you may have talked to that I haven't asked you about." (JA 887, 889.) Guidera never testified to the size or makeup of this group of unnamed, other witnesses.

In specific, Manley's attorney commenced his direct examination of Guidera by questioning him about his conversations with Wilson. Guidera admitted that Wilson had provided two inconsistent accounts of the events leading up to the shooting. When Wilson first talked to Guidera at the hospital after Glover arrived for treatment, Wilson omitted a key detail, namely that he was present at the scene of the shooting. During their second conversation, however, Wilson admitted to observing the shooting directly. Although the record is unclear as to why Manley's attorney was

- 13 -

unable to impeach Wilson on cross-examination during the prosecution's case-in-chief, presumably the strategy behind this line of questioning was to cast Wilson as unreliable and undermine his credibility as a witness for the prosecution by pointing out the two conflicting stories he provided to authorities.

The mere fact that defense counsel conducted this series of questions with a strategy in mind, however, does not end the analysis. We "cannot stop there, for we must also assess if this strategy was itself constitutionally deficient." *Washington v. Hofbauer*, 228 F.3d 689, 704 (6th Cir. 2000). As this Court has previously recognized, "the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel." *Lovett v. Foltz*, 884 F.2d 579, at *4 (per curiam) (unpublished). "[E]ven deliberate trial tactics may constitute ineffective assistance of counsel if they fall 'outside the wide range of professionally competent assistance.'" *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984) (internal citation omitted).

While challenging Wilson's credibility as a witness was admittedly sound trial strategy, which, as we have noted, presumably could have been accomplished fully on cross-examination, defense counsel's subsequent questioning of Guidera when he called him as a defense witness exceeded any constitutionally protected strategy. Specifically, defense counsel's direct examination proved particularly damaging because he prompted Guidera to testify about the alleged statements of several eyewitnesses who corroborated the prosecution's version of the shooting. For example, defense counsel inquired about Guidera's conversations with Titus Brown, who had also testified previously as a witness for the prosecution. Guidera recalled what Brown had told him about the shooting:

He stated that a black pickup truck that he knows as owned by . . . Manley come driving up.  He said he saw . . . Manley in the passenger side, the window down . . . . He saw Steve Glover walk up to the truck; start having a conversation with . . . Manley.  He said the conversation basically consisted of Steve was wanting to end any kind of problems that they were having.  He wanted to settle any kind of disputes.  While they were just talking at that time Tierre Manley pulled out a gun and shot him, shot Steve.

(JA 882-83.)  This recounting of events stands in direct contradiction to Manley's version of the facts, because it suggests that Manley never exited his truck and instead delivered the fatal bullets from the inside of his vehicle.  Thus, this testimony ultimately corroborates the prosecution's version of the facts.  Notwithstanding the fact that the jury already heard this testimony directly from the mouth of Brown earlier in the trial when Brown was called as a prosecution witness, the effect of Guidera's repetition was to bolster the credibility of a state witness and call into question Manley's own characterization of the facts.

After questioning Guidera about his conversation with Brown, defense counsel questioned Guidera about statements made by "any other individuals who you may have talked to that I haven't asked you about," including Tierre Scales, Gary Jackson, and Aaron Porter whom the prosecution did not call as witnesses. (JA 887.)  For example, defense counsel asked Guidera whether, according to all the eyewitnesses with whom he spoke, "[Manley is] the only one they saw having a gun," to which Guidera responded affirmatively. (*Id.*)  Likewise, Guidera testified that all the eyewitnesses with whom he spoke stated "after Steven Glover was shot[,] he fell to the ground . . . Manley was in his pickup truck[,] and it took off.  As it was taking off down the road several people said that they heard other gunshots farther down the road." (JA 887-88.)

These statements undercut Manley's version of the events, that Manley exited his truck and was confronted by Glover and Elliott who were armed with handguns. Instead, these statements confirmed earlier testimony that Manley remained in his truck throughout the shooting and fired the gun that killed Glover. While the jury heard similar testimony during the prosecution's case-in-chief, Guidera's testimony was damaging because it represented the collective recollections of an unknown number of individuals he interviewed while investigating the case. Thus, the result of Guidera's testimony was to bolster the prosecution's version of the shooting. *See Combs v. Coyle*, 205 F.3d 269, 288-91 (6th Cir. 2000) (explaining that defense counsel acted deficiently because his inquiry of an expert witness "directly contradicted the sole defense theory that [the defendant] lacked the requisite intent to commit murder" and because his "two critical errors . . . bolstered the State's case and made [the defendant's] explanation of the events seem less likely")

Moreover, by calling Guidera as a witness, defense counsel paved the way for the prosecution to elicit similarly injurious testimony on cross-examination and failed to object on numerous occasions to seemingly objectionable questions asked by the prosecution. For instance, the prosecution questioned Guidera about his interview with Gary Jackson, an eyewitness to the shooting who did not testify at trial. Specifically, the prosecutor inquired of Guidera, "did [Jackson] tell you he saw who was shooting?" (JA 896.) Guidera replied, "he stated the shots were coming from the pickup truck." (*Id*.) This testimony had a particularly deleterious influence on Manley's case because Guidera identified Jackson as a "good acquaintance" of Manley. (JA 610.) As a friend of Manley, Jackson's account of the events was therefore likely to carry considerable weight with the jury because he would be less likely to corroborate the prosecution's version of the events if not true.

Similarly, the prosecution asked Guidera if, based on all the interviews he conducted with eyewitnesses, whether he received "any statements that said that [Manley] ever got out of the truck?" Guidera responded, "no." (JA 897.) The prosecution continued, "did you get any statements at all from anybody that said that Steven Glover had a gun?" Guidera again replied in the negative. Thus, in addition to multiplying the number of witnesses against his own client, defense counsel, through his botched examination of Guidera, allowed the prosecution to do the same.

That defense counsel acted deficiently in his examination of Guidera is further underscored by an analogous decision of this Court in *Combs v. Coyle*, 205 F.3d at 269. In that case, an attorney for a capital defendant elected to call an expert witness during the culpability phase of the trial to demonstrate that the defendant lacked the requisite mental state for conviction. *Combs*, 205 F.3d at 287. On cross-examination, the expert testified that, in his opinion, although the defendant was intoxicated on the day of the events, he nevertheless acted intentionally and purposefully. *Id*. This Court reviewed the defendant's claim of ineffective assistance of counsel as part of the defendant's habeas petition and concluded that "[a]lthough Combs's counsel's decision to present [the expert's] testimony may be considered a strategic one, it was a decision made without undertaking a full investigation." *Id*. at 288. The Court further opined,

> [the expert's] opinion regarding whether Combs lacked the requisite intent to commit the crimes was crucial to the defense theory; defense counsel's failure to have questioned Fisher in this regard prior to trial is inexcusable. Defense counsel should have known Fisher's opinion on this ultimate issue and should have prepared accordingly.

*Id*. Thus, the Court ultimately determined that "[r]egardless of whether [the defendant's] counsel should have known or instead actually knew [the expert's] opinion regarding [the defendant's] intent

- 17 -

. . . counsel's decision to put him on the stand was objectively unreasonable" under *Strickland*. *Id*.

As in *Combs*, the decision by Manley's lawyer to call Guidera as a witness was objectively unreasonable. Guidera's testimony about the countless eyewitnesses who corroborated the prosecution's version of the facts suggests that defense counsel decided to call Guidera as a witness "without undertaking a full investigation." *See id*. Just as the defense attorney in *Combs* should have known the expert witness's actual opinion about the defendant's mental state, Manley's lawyer should have known that Guidera would testify that the countless individuals he interviewed "had the same conclusion" that Manley remained in his truck and that the bullets emanated from a gun possessed by Manley. (JA 898.) Defense counsel had a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary[,]" *Strickland*, 466 U.S. at 691, and thus his "failure to have questioned [Guidera] in this regard prior to trial is inexcusable." *Combs*, 205 F.3d at 288. Coupled with defense counsel's failure to object to seemingly objectionable questions asked by the prosecutor during his cross-examination of Guidera, we are of the view that Manley's attorney exhibited deficient lawyering.

## 2.    Prejudice

Notwithstanding the fact that Manley's attorney acted deficiently in conducting his questioning of Detective Guidera, we conclude that, against the overwhelming evidence of guilt, his substandard performance did not prejudice Manley's case. *See Strickland*, 466 U.S. at 696 (stating that a verdict only weakly supported by the record is more likely to have been affected by errors than one with overwhelming support); *see also Poindexter v. Mitchell*, 454 F.3d 564, 582 (6th Cir. 2006)

(concluding that "[p]etitioner's defense was not prejudiced" because "[t]he evidence that Petitioner Poindexter killed Kevin Flanaghan was overwhelming"); *Hicks v. Collin*s, 384 F.3d 204, 215 (6th Cir. 2006) (establishing that petitioner was not denied the effective assistance of counsel because "there was overwhelming evidence of . . . guilt" which precluded petitioner from "demonstrat[ing] that there is a reasonable probability that, but for counsel's errors, the factfinder would have reasonable doubt about his guilt" (internal citations and quotations omitted)); U.S. *v. Bavers*, 787 F.2d 1022, 1030 (6th Cir. 1985) (finding that "counsel's performance was not shown to have resulted in deprivation of an essentially fair trial especially in light of overwhelming proof" of defendant's guilt).

First, the medical evidence presented by the prosecution corroborated the eyewitness accounts presented by the prosecution. *See Watson v. Marshall*, 784 F.2d 722, 726 (6th Cir. 1985) (holding that defendant could not satisfy the *Strickland* test "because of [his] failure to establish prejudice, particularly in light of the medical evidence produced at trial in this case"). Specifically, the prosecution called as a witness Dr. Beisser, Deputy Coroner of Lucas County, who performed the autopsy of Glover and who testified that Glover suffered from several defensive wounds, including a bullet wound through his right hand, a bullet entrance wound through his right temple, and a bullet exit wound on the left side of his hand. She further testified that there was no gunshot residue on the body, suggesting that Glover was at least twelve inches from his assailant. Her testimony regarding the path of the bullet was entirely consistent with Dillingham's testimony that Glover raised his hand in defense as Manley delivered a bullet from the inside of his truck. *See Mapes v. Coyle*, 171 F.3d 408, 425 (6th Cir. 1999) (concluding that a defendant was unable to

establish prejudice under *Strickland* because "he was identified by eyewitnesses as the person who shot Allen, and corroborating evidence was admitted indicating he was the shooter").

Beyond this forensic evidence, Wilson, Brown, and Dillingham, all eyewitnesses for the prosecution, testified that Manley never exited the truck and was the only individual armed at the scene of the shooting. *See Campbell v. U.S.*, 364 F.3d 727, 736 (6th Cir. 2004) (holding that petitioner did not succeed on his ineffective assistance of counsel claim"given the overwhelming evidence establishing . . . guilt" from the "no less than four members of the alleged drug conspiracy [who] testified against Campbell at trial"). While admittedly there were aspects of these individuals' personal histories, including their purported gang affiliations and drug use, that might cause a juror to question their credibility, there was no reasonable probability that the jury would have decided the case differently. Moreover, in contrast to the number of witnesses corroborating the prosecution's version of the facts, no one other than Manley testified that Manley exited his truck to confront Glover, that Glover possessed a gun, and that only after hearing gunshots did Manley wrestle Glover's gun from his hand and shoot in self-defense.

Given the strength of the state's evidence, we therefore conclude that defense counsel's errors were insufficient to "undermine our confidence in the trial's outcome." *Richey v. Mitchell*, 395 F.3d 660, 687 (6th Cir. 2005) (quoting *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993)). Ultimately, Manley has failed to demonstrate that "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's issuance of a conditional writ of habeas corpus.